[No. C003272. Third Dist. Feb. 28, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES NEWLUN, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

\*All parts of this opinion shall be published except parts V through XI of the Discussion.

COUNSEL

Stan Naparst for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Janet Bangle and Janet Neeley Kvarme, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**SIMS, J.**—Defendant Charles Newlun was convicted by jury of 15 counts of lewd and lascivious acts with a child under the age of 14 (Pen. Code, § 288, subd. (a); hereafter section 288(a)).[1]

On appeal he raises numerous contentions of error, including denial of due process, admission of incompetent testimony, and instructional error. He contends further that the evidence was insufficient to justify his conviction. Finally, he alleges ineffective assistance of counsel.

In an opinion previously filed in this case we affirmed the judgment. Our Supreme Court granted review and thereafter remanded the case to this court with directions to vacate our original opinion and reconsider the matter in light of *People* v. *Jones* (1990) 51 Cal.3d 294 [270 Cal.Rptr. 611, 792 P.2d 643]. We requested supplemental briefing from the parties on the application of *Jones* to this case. Having received and considered the parties' supplemental briefs, we again affirm the judgment.[2]

In this published portion of the opinion, we consider and reject defendant's contentions that the evidence does not support the judgment and that

---

[1] All further undesignated statutory references are to the Penal Code.

[2] Although defendant's supplemental briefing is ambiguous as to whether defendant intends to renew all of the contentions raised in his original briefing, we deem all of those contentions preserved and address them here.

he was denied fair notice of the charges against him. In an unpublished portion of the opinion we consider and reject defendant's remaining contentions of error.

## FACTUAL AND PROCEDURAL BACKGROUND

The victim, M., was the only child of defendant and his former wife, Danna.

Mrs. Newlun began to work full-time in May 1983, when M. was five months old. Defendant did not work due to medical disability; he stayed home and cared for M. Although Mrs. Newlun's mother, sister, and grandmother occasionally cared for M., and a neighbor did so on one occasion, defendant was M.'s primary caretaker so long as the Newluns lived together.

In February 1984, when M. was 13 months old, she was examined by Dr. Rena Jain, her pediatrician. Dr. Jain saw no signs of sexual molestation at this time. However, a month later, Dr. Jain examined M. again and observed warts around M.'s anal opening. In her experience, such warts in a young child were likely to be venereal warts unless proven otherwise. Suspecting molestation, she referred M. to Dr. Reed Lockwood, a dermatologist. Dr. Lockwood determined that the warts were probably contracted by contact with an infected penis. However, the medical literature at that time suggested other possible means of transmission, and M.'s mother denied that the child could have been molested. Therefore, Dr. Lockwood did not report the case to child protective services.

Defendant and Mrs. Newlun separated in March 1985. They dissolved their marriage in June 1985. From March 1985 on, the parents shared physical custody of M. Other adults, such as Mrs. Newlun's parents and other family members, a friend and a roommate of Mrs. Newlun, and Mr. Newlun's live-in girlfriend, had access to M. or occasionally cared for her after March 1985, but no evidence was presented that any of these people might have molested M.

At the end of April 1986, Danna picked M. up to bring her home from a visit to defendant. M. was unusually dirty and had "multiple scratches." This disturbed Danna so much that she took M. immediately to see Dr. Jain. Dr. Jain observed that M.'s hair was streaked and matted, her elbows and legs had many abrasions, her buttocks and upper thighs were covered with red crisscross marks, and the areas around her rectum and vagina were red. She did not examine the rectum or vagina internally.

Dr. Jain was unable to learn anything from M. about how she got her injuries. Although normally talkative and friendly, M. had become silent and hostile on recent visits. She did not like to be examined. She would specifically refuse to talk about her father, getting very upset when he was mentioned.

The day after this episode Danna called the court in an unsuccessful attempt to stop defendant's visitation.

On June 15, 1986, Danna picked M. up at defendant's house and brought her home. At around 1 a.m. on June 16, M. came into Danna's room crying. She began to take her clothes off. She climbed on top of Danna's naked body, moved Danna's legs apart and put her body in between Danna's legs. Danna asked her what she was doing; she answered, "This is the way daddy makes me sleep." The following day Danna's mother made an appointment for M. to be seen by child protective services.

The next day, M. was examined by Dr. Perry Pugno, medical director of Shasta General Hospital and director of the hospital's family medicine residency training program. He had examined several hundred children for suspected molestation.

Dr. Pugno found that M.'s vaginal area had suffered injuries consistent only with repeated penetration by an adult penis. The band of tissue around the hymen was stretched and damaged; there were scars and thinning of the skin, typical of injuries caused by repeated reentry after healing. There was no reasonable possibility the injuries could have been accidentally self-inflicted, and intentional self-infliction was equally unlikely because of the painfulness of the injuries. At an "absolute minimum" it would have taken half a dozen sexual assaults to produce these injuries.

Dr. Pugno observed even more striking evidence of molestation in M.'s anal region. When he retracted her buttocks to inspect the anal opening, her anal muscle spontaneously relaxed and allowed the anus to gape open nearly an inch. This response, known as the "wink reflex," is typical in children who have been repeatedly sodomized, according to Dr. Pugno. (Children who have not been sodomized tighten the anal opening in response to parting of the buttocks.) Dr. Pugno had seen only two or three cases out of two hundred where the anus dilated so widely as here. Dr. Pugno testified it would have taken at least 12 to 14 penetrations over a 6-month period to establish such a pronounced reflex. There could have been as many as 30. The molestations had probably continued up to around four weeks before the date of the examination.

Several days after Dr. Pugno's examination, Danna and her mother took M. to the Shasta County Sheriff's Department, where she was interviewed by Detective Terry Nielsen. M. did not respond appropriately to Nielsen's questions about who had "put something up her bottom"; she merely named and pointed to objects she saw in the room. However, in a second interview with Nielsen, M. apparently indicated defendant was responsible.

In July 1986 M. was referred to Patricia Bay, a marriage and family therapist with five years' experience doing intake work in sexual abuse cases for Shasta County Children's Protective Services. Ms. Bay saw M. 33 times on a weekly basis. At some time during the therapy sessions, M. indicated to Ms. Bay that defendant was her molester.

By a complaint filed in Redding Municipal Court, defendant was charged with one felony count of lewd and lascivious conduct upon a child under fourteen (§ 288(a)), and one felony count of sodomy (§ 286, subd. (c)). After a preliminary hearing at which no evidence of sodomy was adduced, defendant was held to answer on count one only.

By an information filed in Shasta County Superior Court, defendant was charged with 20 counts of lewd and lascivious acts upon a child under 14 (§ 288(a)). At some time before the start of trial, for reasons not disclosed by the record, counts 16-20 were dropped. Thus, defendant faced trial only on counts 1 through 15. These counts named the times of the alleged offenses as "on or about March 1984 through June 1986."

M., who was four years old at the time of trial, testified. Although she consistently identified defendant as her molester, her testimony contained inconsistencies and contradictions as to specific acts of molestation. She testified that defendant "stuck his peepee in my peepee," but could not say accurately or consistently how often. When first asked, she counted to 11; when asked again, she counted to 5. She testified that it hurt, that she cried when he did it, and that he did not stop when she asked him to.

Asked if defendant had done anything with her mouth, she said at first "No" or "I don't know." When the question was rephrased more specifically—"Did he put his peepee in your mouth?"—she said "No" repeatedly. The prosecutor asked: "Do you remember telling me he put his peepee in your mouth, and that he pee'd in your mouth?" She continued to answer "No." The prosecutor asked: "Do you remember telling me that it was yucky?" Over objection, he was allowed to continue this line of questioning. Eventually, M. answered the question: "What tasted yucky, M.?" by saying "His peepee" and pointing to her mouth.

She was then asked if defendant ever touched her with his fingers or if she ever put her finger inside him. She repeatedly said "No."

Next she was asked whether defendant ever put his peepee in her bottom. She said he did. She was not asked how many times he had done it.

She was given anatomically correct dolls to demonstrate what defendant had done to her. She undressed them and put the male doll on top of the female doll. She said defendant had gotten on top of her like that and "put his peepee in [her] peepee." She said at this time that he did not put his penis in her mouth.

When asked where defendant had done the acts described, she said "In his backyard." She denied that anyone other than defendant had molested her.

Ms. Bay, M.'s therapist, was called for the purpose of impeaching M. with prior inconsistent statements as to specific acts she had denied on the stand that defendant committed. Over hearsay objections, she was allowed to testify that M. told her during therapy that she and defendant had digitally penetrated each others' anuses. Ms. Bay described how M. had used anatomically correct dolls to demonstrate particular acts. She was then given such dolls and showed what M. had done with them.

Defendant testified on his own behalf. He denied having committed any of the alleged acts. He denied that M. was ever filthy when she left his home. He attributed the scratches she had on April 30, 1986, to her having played in the bushes. He claimed she was always playing with herself and trying to stick things into her rectum or vagina but did not claim she could have sustained the injuries observed by Dr. Pugno in this manner. He also testified that for four or five months during the period of the alleged offenses he had had two teenaged male martial arts students living with him. He did not claim he knew of any evidence either of them might have assaulted M.

Defendant was found guilty on all 15 counts. The court sentenced defendant to an aggregate term of 20 years in state prison.

Defendant filed a timely notice of appeal.

## DISCUSSION

### I

Defendant contends no substantial evidence supports the judgment and he received inadequate notice of the charges against him.

In *People* v. *Jones, supra*, 51 Cal.3d 294, our Supreme Court defined the standards for reviewing questions of sufficiency of the evidence and due process in so-called resident child molester cases where the defendant is accused of multiple offenses and the victim's testimony concerning particular acts is "generic" (i.e., nonspecific as to time and place).

As to sufficiency of the evidence the court held that a child victim's generic testimony will support a conviction on one or more counts, provided the following test is met: "The victim, of course, must describe *the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct (e.g., lewd conduct, intercourse, oral copulation or sodomy). Moreover, the victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping'). Finally, the victim must be able to describe *the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us') to assure the acts were committed within the applicable limitation period. Additional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony, but are not essential to sustain a conviction." (51 Cal.3d at p. 316; italics in original.)

As to due process, the court addressed two distinct problems: "the right to prepare and present a defense, and the right to a unanimous jury."[3] (51 Cal.3d at p. 316.) The court broke down the former problem into "two related components, namely, the right to *notice* of the charges, and the right to *present a defense* to those charges." (*Id.* at p. 317; italics in original.)

The court held that the right to notice in cases where molestation charges are based on generic testimony is sufficiently protected by a combination of means normally available to the defendant: "In addition to the advance notice provided by the information and preliminary examination, . . . defendant may learn further critical details of the People's case through demurrer to the complaint or pretrial discovery procedures." (51 Cal.3d at p. 317.)

The court held further that generic testimony does not deprive a defendant of the right to present a defense. First, defendants in resident child molester cases can seldom offer an alibi or identity defense, so the lack of specificity as to time and place in the charges will rarely deprive a defendant of a defense that would otherwise have been available. To the extent a

---

[3] Since defendant makes no contention he was deprived of his right to a unanimous jury, we need not explore *Jones*'s discussion of that issue.

defendant can offer an alibi defense covering some time periods alleged in the information, this fact could undermine the credibility of the victim's testimony as to the remaining counts. (51 Cal.3d at p. 319.)

In addition, where the case turns on the credibility of the victim, the defendant has numerous trial techniques available: his own direct testimony, cross-examination of the child and supporting witnesses, and expert character evidence showing that the defendant does not have the personality profile of a child molester. (51 Cal.3d at p. 320.)

Finally, a defendant "has a variety of procedural due process remedies available to obtain relief from unwarranted prosecution of punishment, including demurrers (Pen. Code, § 1002 et seq.), pretrial motions to set aside the information or indictment (Pen. Code, § 995), and motions for judgment of acquittal (Pen. Code, § 1118), modification of verdict (Pen. Code, § 1181) or new trial (*ibid.*)." (51 Cal.3d at p. 320.)

For all these reasons, the court held that the defendant is not deprived of the right to present a defense where molestation charges are founded on generic testimony.

## II

In his supplemental brief, defendant argues that *Jones* was wrongly decided. He contends that the Sixth Amendment to the federal Constitution, as made applicable to the states by the Fourteenth Amendment, requires that a defendant be given more particular notice of the charges than is required by *Jones*. He asserts the supremacy clause of the federal Constitution (U.S. Const., art. VI, cl. 2) requires us to disregard *Jones*.

However, we may not do so. As defendant acknowledges, *Jones* is expressly premised on an interpretation of the Sixth Amendment. (See *Jones, supra,* 51 Cal.3d at p. 317.) That interpretation is binding on this court. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937]; *People* v. *Neer* (1986) 177 Cal.App.3d 991, 999 [223 Cal.Rptr. 555].) Defendant's attack on *Jones* must be made in a court higher than this one.

## III

Defendant next contends the evidence was insufficient to support the judgment as to any count under *Jones* because M.'s testimony failed to

establish with specificity either the kinds or the number of lewd acts defendant committed.[4] (*Jones, supra,* 51 Cal.3d at p. 316.) We disagree.

Contrary to defendant's assertion, M.'s testimony sufficiently established that defendant committed three different types of lewd act: vaginal penetration, anal penetration, and oral copulation.[5] The fact that this testimony contained inconsistencies, as detailed above, goes to its credibility, not to whether it met the *Jones* test for specificity. (See *Jones, supra,* 51 Cal.3d at p. 315.)

Defendant is correct, however, that M.'s testimony did not adequately establish the number of lewd acts committed. M. testified first that defendant penetrated her vaginally 11 times, then a moment later stated that he did it only 5 times. This discrepancy was never resolved. Furthermore, M. gave no testimony whatever about the number of acts of sodomy or oral copulation defendant committed.

*Jones* says, "[T]he victim must describe the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping')." (*Jones, supra,* 51 Cal.3d at p. 316.) If we were to read *Jones* literally as holding that the victim's testimony *alone* must establish the number of acts committed, we would be required to reverse on this ground.

However, we do not read *Jones* so narrowly, because such a reading would lead to absurd results. If the literal language of *Jones* defined the limits of the court's holding, an appellate court reviewing the sufficiency of the evidence would be precluded from considering reliable and probative evidence offered by witnesses other than the victim. For instance, under this view of the holding in *Jones*, the reviewing court could not consider the unrebutted eyewitness testimony of a family member who caught the defendant in the act of molesting the victim. We cannot believe the Supreme Court intended such a result.

Moreover, in *Jones* the Supreme Court disapproved a line of appellate cases beginning with *People* v. *Van Hoek* (1988) 200 Cal.App.3d 811 [246 Cal.Rptr. 352] which had found insuperable evidentiary and due process

---

[4] Defendant raises no challenge to the sufficiency of M.'s testimony as to the third *Jones* factor, the general time period of the offenses.

[5] Apparently relying on M.'s testimony from the preliminary hearing plus the trial testimony of certain defense witnesses, defendant asserts that M.'s trial testimony as to oral copulation described acts which allegedly occurred in another state and therefore were not chargeable against him in California. As we explain below, the trial testimony as a whole showed that defendant committed acts of vaginal and anal penetration at least equal in number to the counts of which he was convicted; therefore we need not consider whether there was substantial evidence of acts of oral copulation occurring in California.

problems in child molestation prosecutions that rest on the victim's generic testimony.[6] By so holding, the court signaled its agreement with those appellate cases which had criticized *Van Hoek* and its progeny on the ground that *Van Hoek*'s analysis would effectively insulate resident child molesters from prosecution. (*Jones, supra,* 51 Cal.3d at pp. 308-320.) ■ Given the court's concern to avoid this result, we cannot read *Jones* so as to insulate from prosecution any resident child molester whose victim is too young to testify with the requisite specificity as to the kind, number, and time period of the offenses committed, even where other witnesses can offer competent and reliable testimony as to all these points. Rather, we take *Jones*'s holding to define what constitutes substantial evidence in cases of this kind and to make clear that the victim's testimony must establish all the necessary factors if the prosecution is relying exclusively on that testimony to prove its case. We do not construe *Jones* to hold that a reviewing court may not examine the whole record to determine whether substantial evidence supports a judgment merely because the matter under review is a child molestation case involving generic testimony. In particular, we do not read *Jones* as holding that the number of lewd acts committed on a child may not be established by reliable evidence of the opinion of a physician.

■ In the present case, the minimum number of acts committed was established by the unrebutted testimony of Dr. Pugno that it would have taken at least 6 vaginal penetrations and at least 12 to 14 anal penetrations to produce the injuries and abnormalities he detected on examining M. The competency of Dr. Pugno as an expert witness on this subject was never questioned. Given that expert medical testimony about the physical characteristics of an injury is generally competent to prove the cause of the injury (*People* v. *Bledsoe* (1984) 36 Cal.3d 236, 249 [203 Cal.Rptr. 450, 681 P.2d 291]), it would be anomalous if a reviewing court could not consider such testimony as substantial evidence of molestation. We conclude Dr. Pugno's testimony constitutes substantial evidence supporting the 15 counts upon which defendant was convicted.

Defendant further contends Dr. Pugno's testimony established only 12 separate offenses. This argument appears to be based on a misreading of the record. Dr. Pugno did not testify, as defendant appears to believe, that his observations showed "anywhere from 12 to 30 penetrations" without regard to the type of penetration. Rather, he testified that there were at least 12 anal penetrations, and in addition that there were at least 6 vaginal penetrations. This testimony established without contradiction that there were at least as many acts committed as defendant was charged with.

---

[6] *People* v. *Vargas* (1988) 206 Cal.App.3d 831 [253 Cal.Rptr. 894]; *People* v. *Luna* (1988) 204 Cal.App.3d 726 [250 Cal.Rptr. 878]; *People* v. *Atkins* (1988) 203 Cal.App.3d 15 [249 Cal.Rptr. 863].

■ Defendant also argues that the prosecution failed to prove 15 separate violations of section 288(a) because even if 15 penetrations occurred there was no evidence that they did not form part of a single indivisible transaction. The record belies this contention. Dr. Pugno testified that the hymenal scarring and thinning of the skin he observed in M.'s vagina were caused by repeated traumatic penetrations over a period of time during which the area had healed and then been reinjured. He also testified that the anal penetrations had occurred over an approximate six-month period. This evidence is inconsistent with defendant's hypothesis (unlikely in any event) that all 15 penetrations could have been performed in an uninterrupted sequence during a single episode.

■ It is unclear whether defendant contends the punishment for any of his convictions must be stayed pursuant to section 654.[7] Defendant cites *People* v. *Siko* (1988) 45 Cal.3d 820 [248 Cal.Rptr. 110, 755 P.2d 294]. There, the defendant was sentenced for three violations—rape, sodomy, and lewd conduct with a child—although the lewd conduct for which he was sentenced consisted only of the single acts of rape and sodomy separately charged against him. (*Id.* at p. 823.) The court held such sentencing constituted double punishment in violation of section 654. (*Id.* at p. 826.) Here, section 654 does not require a stay of any of the terms imposed because the evidence, recounted above, suggests the various lewd acts took place at different times. (See *People* v. *Perez* (1979) 23 Cal.3d 545 [153 Cal.Rptr. 40, 591 P.2d 63].)

## IV

■ Defendant next asserts prejudice from the violation of his due process right to notice of the charges against him. According to defendant, some of the counts on which he was convicted were neither included in the information nor supported by evidence adduced at the preliminary hearing.

Defendant is correct that no evidence of acts of sodomy was adduced at the preliminary hearing, although, as we have noted, such evidence was adduced at trial. At the preliminary hearing M. testified that defendant put his penis in her body 10 times and orally copulated her 10 times. She gave no testimony specifically alleging sodomy.[8] At trial, as described above, M.

---

[7] Section 654 provides in relevant part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

[8] The People suggest that M.'s testimony about penile penetration "could certainly have encompassed a sodomy allegation." Given that the prosecutor at the preliminary hearing noted for the record M. was pointing toward her vagina as she described the nonspecific penetrations, we do not see how this testimony could have put defendant on notice that he would face sodomy charges.

testified that defendant had sodomized her, and Dr. Pugno opined that M. had been sodomized at least 12 times.

Defendant relies on *People* v. *Pitts* (1990) 223 Cal.App.3d 606 [273 Cal.Rptr. 757]. In *Pitts*, in response to the prosecution's motion to amend the information in midtrial to include a large number of offenses testified to for the first time at trial, the defendants filed motions to dismiss, motions opposing election, motions alleging some offenses were not shown by evidence adduced at the preliminary hearing, demurrers, and motions for continuance. (*Id.* at p. 900.) *Pitts* held that due process was violated by the trial court's granting of the prosecution's motion to amend the information because the evidence adduced at trial had never been shown at the preliminary hearing. (*Id.* at pp. 903-908.)

This case is distinguishable from *Pitts* because here defendant made no objection, in any form, based on a lack of notice of the charges.

As a general rule, defendant may not contend on appeal that the trial court committed error unless the defendant has tendered an objection to the trial court on the ground later asserted on appeal. (See *People* v. *Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].) As a rule, "it would be wholly inappropriate to reverse a superior court's judgment for error it did not commit and that was never called to its attention." (*People* v. *Lilienthal* (1978) 22 Cal.3d 891, 896 [150 Cal.Rptr. 910, 587 P.2d 706], fn. omitted.) Here, having failed to claim surprise or to request a continuance, defendant has waived objection to the evidence adduced at trial on the ground he did not have adequate notice of it. (*People* v. *Wrigley* (1968) 69 Cal.2d 149, 160 [70 Cal.Rptr. 116, 443 P.2d 580].)

We think it particularly appropriate to insist on an objection in the present context. ■ "Generally speaking, the rationale underlying the rule requiring objection below as a prerequisite to complaint on appeal regarding some error by the trial court is predicated on the premise that, in its absence, the People would be deprived of the opportunity to cure the defect in the trial court and the defendant would be allowed to gamble on a favorable result—secure in the knowledge that if he did not prevail there, he would be able to prevail on appeal. (See *People* v. *Rogers* (1978) 21 Cal.3d 542, 548 [146 Cal.Rptr. 732, 579 P.2d 1048] and cases there cited.)" (*People* v. *Jones* (1980) 111 Cal.App.3d 597, 605 [169 Cal.Rptr. 28].) ■ Unfairness because of lack of notice may often be cured in the trial court by granting the defendant a continuance of the trial to allow a defendant fair opportunity to meet the new evidence. (See *Jones, supra,* 51 Cal.3d 294.)

■ Nor will we assume counsel was ineffective for failure to object, because the record does not show that a due process objection would have

been meritorious. ■■■ "Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence offered at his trial." (*Jones, supra,* 51 Cal.3d at p. 317.) *Jones* says, "In addition to the advance notice provided by the information and preliminary examination, the cases observe that defendant may learn further critical details of the People's case through demurrer to the complaint *or pretrial discovery procedures.* [Citations.]" (*Ibid.,* italics added.)

Here, Dr. Pugno's report detailing his findings and conclusions, including the conclusion that M. had been sodomized, was prepared immediately after his examination of M. on June 18, 1986. The preliminary hearing in the case was held on October 21, 1986. The original information was filed on November 3, 1986. Jury trial began on March 31, 1987. ■■■ The record does not show whether defendant obtained Dr. Pugno's report through pretrial discovery, but clearly he could have done so. Given the possibility defendant was fairly put on notice to defend against acts of sodomy by Dr. Pugno's report, we will not assume a violation of due process on the record before us.

Trial counsel is not ineffective for failing to make a fruitless objection. (*People v. Jackson* (1989) 49 Cal.3d 1170, 1189 [264 Cal.Rptr. 852, 783 P.2d 211].) Since the record on appeal does not show that counsel was necessarily ineffective, we shall not assume he was. (See *People v. Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

## V - XI*

### DISPOSITION

The judgment is affirmed.

Sparks, Acting P. J., and Davis, J., concurred.

A petition for a rehearing was denied March 26, 1991, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied May 30, 1991.

---

*See footnote, *ante*, page 1590.