[No. B082840. Second Dist., Div. Seven. Apr. 8, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT J. BISHOP, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II., III., and V.

**COUNSEL**

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Linda C. Johnson and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

JOHNSON, J.—Appellant, Robert J. Bishop, appeals his conviction for murder during the commission of a robbery. He contends the court's instruction, during deliberations, which permitted the jury to find the special circumstance allegation true on a theory of aiding and abetting deprived him of due process and effective assistance of counsel because counsel did not have an opportunity to address this newly introduced theory in closing argument. In addition, appellant claims there was insufficient evidence to support the convictions on an aiding and abetting theory but, if there was, it was error not to instruct the jury his liability as an aider and abettor ended when the stolen property was carried away to a place of temporary safety. Appellant also argues the trial court erred in failing to grant his motion to suppress evidence of a canvas money bag found in his home, and in allowing evidence he had often referred to the victim as a "black bitch." We affirm.

### FACTS AND PROCEEDINGS BELOW

Appellant worked for the Stanley Smith Security company as a security guard. From October 26, 1991, to January 19, 1992, the security company assigned appellant to work as a guard for the "Parking Violations Bureau" located at 8835 West Pico Boulevard in Los Angeles. The public used this facility to pay traffic tickets and fines.

The victim, Effrage Davis, was the supervisor of the Parking Violations Bureau. Each day she would open the office between 7 a.m. and 7:30 a.m. Security guards were to arrive at 7:30 a.m. and other employees would arrive between 7:45 and 8 a.m. Davis let personnel into the office through the frosted glass back door.

In February 1992, Elwood Bush worked as a security guard at the Parking Violations Bureau. On February 28th, Bush arrived about 7:15 a.m. and saw Davis's car parked outside the office. He parked in a parking structure and ate breakfast in his car. At 7:30 a.m. Bush went to the back door of the office and knocked. Normally, Davis would ask, "Elwood, is that you?" After Bush answered, "Yes," Davis would open the door and let him in. This time no one answered his knock, so he pushed on the door. The door opened and Bush went inside. He found Davis lying facedown on the floor by the safe. Davis had been shot once through the back of the head. Davis died from the single gunshot wound.

The safe was empty except for a plastic bag containing checks, a small amount of cash and the stamp for the city seal. Bank bags containing the

previous day's receipts of $16,677 were missing, as was the cashiers' $500 start-up money for the next day.

Appellant's wife, Heather, and appellant's friend, Gilbert Holguin, testified for the prosecution under grants of immunity. Appellant met Holguin when they both worked for the same company as security guards.

Appellant did not like Effrage Davis. She made him do tasks unrelated to his job as a security guard. She complained when he arrived late for work and otherwise caused problems for him at the Parking Violations Bureau. Appellant referred to Davis as a "big, fat, ugly, black, no-tooth, ugly bitch."

By August or September of 1991, appellant and Heather had serious financial difficulties. Certain bill collectors threatened Heather with legal action. Later Heather learned she was subject to criminal prosecution for numerous checks she had written which were returned unpaid for insufficient funds. In January of 1992, appellant told Heather of his plan to improve their financial condition. He and Holguin planned to burglarize the Parking Violations Bureau.

On February 24, 1992, Holguin brought a safe to appellant's and Heather's house in the trunk of his car. Appellant tried to open the safe using a stethoscope. When he failed Heather suggested they just steal the whole safe. Appellant rejected the suggestion because the safe at the Parking Violations Bureau was too big, too heavy and securely bolted to the floor.

Two days later on February 26, 1992, appellant and Holguin went to stakeout the Parking Violations Bureau. They arrived about 6:35 a.m. and parked in the back of the building. After sitting in the car for awhile, appellant walked up to a wall, stayed there for a minute and returned to the car. He told Holguin that Davis had arrived at the office. They drove off.

During the drive home appellant told Holguin stealing money from the Parking Violations Bureau would solve his financial difficulties. He also told Holguin he would have to kill Davis to eliminate any witnesses to the crime.

When they arrived home appellant told Heather they could not just steal the safe and that he decided he would have to kill Davis. Heather asked him why and appellant replied, "because dead men tell no tales." Heather was not particularly bothered about stealing the money because they were "young and struggling financially." But she was shocked appellant would kill Davis and did not believe him.

The next day Holguin called Heather. Holguin claimed he tried to suggest alternatives for Heather and appellant to raise some cash. He suggested they

borrow money from their parents. He also suggested appellant could help him sell marijuana. Heather rejected these suggestions because they needed a lot of money right away.

On February 28, 1992, appellant woke up at 5 a.m. and left the house. Heather woke up between 8 a.m. and 8:30 a.m. Appellant returned in Heather's car approximately 15 minutes after Heather got out of bed. Appellant was wearing a black leather jacket and black jeans and was carrying a motorcycle helmet and a gym bag.[1]

In the bedroom, appellant took out his gun, five rounds of ammunition and one empty shell.[2] The gun smelled like gun powder. Appellant emptied the contents of the gym bag on the bed. The bag contained approximately $17,000 in bundled money, a deposit slip with notations of denominations of money on it, and a series of cloth bags with numbers on them. Heather went to the bathroom and got sick. She later returned to the bedroom and helped appellant count the money. Appellant hid the cash in the base of a lamp in the living room. Appellant put dust in the barrel of the gun to make it appear as though it had not been fired.

According to Holguin, appellant called when he got home and said, "I did it." Within the hour Holguin arrived at appellant's and Heather's residence. Appellant and Holguin went into another room to talk. Appellant told him he went to the back door of the Parking Violations Bureau wearing his "equipment," meaning his firearm, boots, work pants, a leather jacket and leather gloves. Appellant said he knocked on the door and said, "Security." When Davis let him in she asked why he was not in uniform and asked what had happened to the other security guard. Appellant told her he was not coming in. Appellant pulled out his gun and ordered Davis to open the safe. He told her to turn around and "kiss the safe." Appellant then shot Davis in the back of the head. As appellant grabbed the money bags out of the safe he noticed blood gushed from Davis's head like a fountain.[3]

When they reappeared Holguin told Heather there might be blood on appellant's clothes and to wash them immediately and take appellant's leather jacket to the cleaners. The two men then went into the yard and burned the money bags.

Appellant told Holguin he threw some latex gloves out of the car window after leaving the Parking Violations Bureau. He and Holguin drove in

---

[1]Appellant told Heather he wore the motorcycle helmet even though he drove her car because if anybody saw him they would look for someone on a motorcycle.

[2]Appellant and Holguin regularly carried guns as part of their work as security guards. According to Heather, appellant used .38-caliber bullets in a .357-caliber magnum gun so the barrel would not leave groove marks on the bullets.

[3]About two weeks later appellant also told Heather these various details of the crime.

Holguin's car to retrieve the gloves. Holguin spotted the gloves in an alley near the Parking Violations Bureau. Holguin got out of the car and picked them up.

That afternoon appellant went to work as usual so nothing would look out of the ordinary. Before he left he gave Holguin $2,000 for a pound of marijuana.

In the following months Heather helped appellant spend the money. They paid outstanding bills and back rent. They had her car and his motorcycle repaired. They rented a car and took a trip to Mexico where they purchased clothes, fireworks and blankets. They purchased a boa constrictor and a pedigree dog. Appellant bought Heather a diamond ring and they later took a trip to Las Vegas. Heather told her cousin, who accompanied them on the trip to Mexico, their money had come from appellant's drug sales.

A month or two after the murder appellant became withdrawn. He had nightmares. He became violent and physically abusive toward Heather. He threatened to kill Heather if she ever told anyone about the murder, or if she had an affair with another man, or for any other good reason that warranted it. Heather had had an affair but claimed it had not been with Holguin, whom she found scary and physically unattractive. Holguin also denied having an affair with Heather.

At some point Heather began to fear for her safety. On October 10, 1992, with her stepfather's assistance, she moved many of her and her children's belongings out of the house and placed them in storage. At Heather's and her parents' request, police watched the premises while they moved as much furniture and clothing as they could out of the house. Heather went to a battered women's shelter in Northern California.

On November 1, 1992, Heather went to the police and told them about the robbery/murder. The police interviewed Heather several times, each time tape recording the interview. Heather did not mention Holguin's name or involvement in the crimes on the first two occasions and did not admit his involvement until police directly asked her about Holguin. She claimed she was afraid of Holguin and what his friends might do to her if she admitted his involvement in the crimes.

Appellant was arrested at home on November 1, 1992. He consented to a police search of the house. Police recovered a pair of black leather gloves and a pair of latex gloves. In a safe police found an envelope with numbers on it totaling $14,000. Heather's stepfather gave police appellant's gun

which he had removed from the house during Heather's earlier move. Ballistic tests established appellant's gun had fired the bullet found lodged in Davis's head.

Five days later Heather and the police returned to the house. Heather wanted to remove additional property from the house and police wanted to conduct an additional search. Heather consented to a police search of the house. The locks had been changed and Heather had to climb into the house through the kitchen window. In this search police recovered a plain white canvas money bag from the bedroom.

Appellant testified in his own defense at trial. He denied he had anything to do with the crime and denied playing any part in the planning or execution of the crimes. He claimed he was home sleeping at the time the crimes allegedly occurred. He testified he first learned of Davis's murder when police began their investigation by fingerprinting and interviewing all persons potentially connected with the Parking Violations Bureau. This investigation necessarily included appellant as a security guard who had previously worked at that facility.

Appellant's testimony suggested Heather and Holguin might instead be responsible for the crimes. He testified Heather had always expressed a serious interest in his work. Appellant said when he would come home from work she would ask questions about what had happened that day on the job and encourage him to talk about his work.

Appellant, and other witnesses, described how appellant and Holguin used to exchange guns when they worked together as security guards and how they practiced with each other's guns at a shooting range.

Appellant believed Heather and Holguin had been having an affair. He testified sometimes he would come home and find Holguin and Heather together looking as if they had been drinking for some time. On these occasions Heather would always say Holguin had only arrived five minutes earlier. Other witnesses testified they had seen Holguin's car at appellant's house at times appellant's motorcycle was not there.

On rebuttal, the People presented evidence Holguin's gun was in a pawn shop on the day of the robbery/murder.

A jury convicted appellant of first degree murder (Pen. Code, § 187, subd. (a), count I) and second degree robbery (Pen. Code, § 211, count II). The jury was unable to agree whether appellant personally used a firearm in the

commission of the offenses (Pen. Code, § 12022.5, subd. (a)). After further instruction and deliberations, the jury found true the special circumstance allegation the murder occurred during the commission of the robbery (Pen. Code, § 190.2, subd. (a)(17)).

The trial court sentenced appellant to the term of life without the possibility of parole for the first degree murder offense with the special circumstance finding. The court also imposed the midterm of three years for the robbery conviction and stayed execution of sentence. Appellant appeals from the judgment of conviction.

## DISCUSSION

I. *In the Circumstances of This Case Appellant Was Not Denied a Fair Trial and the Effective Assistance of Counsel When the Jury Was Instructed After Closing Argument He Could Be Found Guilty of Murder During the Commission of a Robbery as an Indirect Participant.*

The prosecution's theory throughout was appellant personally robbed Davis at the Parking Violations Bureau and shot Davis during the commission of the robbery. The defense theories were denial and alibi. The defense claimed appellant was not involved in the crimes in any respect, and instead Heather and Holguin probably committed the charged crimes.

During discussion on instructions defense counsel requested the entire series of instructions on principals, accomplices and aiding and abetting.[4] Counsel wanted the jury instructed they should view Heather's and Holguin's testimony with distrust. Defense counsel's proposed theory was Heather and Holguin aided and abetted the burglary as a matter of law, and if the jury found they aided and abetted the robbery and/or murder as well, or found the natural and probable consequence of the burglary was robbery and/or murder, then the jury should be told their testimony had to be viewed with distrust and could only be considered as evidence of guilt against appellant if the jury found independent corroborative evidence to support Heather's and Holguin's testimony.

---

[4]The requested instructions included CALJIC No. 3.00 ("Principals—Defined"); CALJIC No. 3.01 ("Aiding and Betting—Defined"); CALJIC No. 3.02 ("Principals—Liability for Natural and Probable Consequences"); CALJIC No. 3.10 ("Accomplice—Defined"); CALJIC No. 3.11 ("Testimony of Accomplice Must be Corroborated"); CALJIC No. 3.12 ("Sufficiency of Evidence to Corroborate an Accomplice"); CALJIC No. 3.13 ("One Accomplice May Not Corroborate Another"); CALJIC No. 3.18 ("Testimony of Accomplice to be Viewed With Distrust"); CALJIC No. 3.19 ("Burden to Prove Corroborating Witness is an Accomplice"); and a special instruction relating these principles to Heather and Holguin as accomplices to burglary of the Parking Violations Bureau.

The prosecutor objected to any instructions on accomplices and aiding and abetting. The trial court was not inclined to give the instructions and pointed out this theory was inconsistent with appellant's defense he had nothing to do with the crimes. Defense counsel urged the court to reconsider, and argued a defendant is entitled to present inconsistent defenses to the jury. The trial court agreed to give the instructions but noted it had modified the wording on the special circumstance instruction to delete any reference to potential liability as an indirect participant in the crime. Thus, in order to find the special circumstance true, the jury had to find appellant personally killed the victim while personally committing the robbery.

In closing arguments the prosecutor urged the jury to find appellant personally robbed and murdered the victim. She told the jury not to concern themselves with the instructions on accomplices because there was more than adequate evidence to convict appellant of the charged crimes even without Heather's and Holguin's testimony. Defense counsel, by contrast, did not even mention the words "accomplice" or "aiding and abetting" or even allude to the alternative defense theory in argument. Instead, defense counsel argued appellant played no role in either the robbery or murder and, if anything, it was more likely Heather and Holguin had committed the crimes.

After more than a day of deliberations the jury sent a note asking for the definition of second degree robbery and asking whether, and under what circumstances, an accomplice can be charged with second degree robbery. The trial court defined second degree robbery for the jury and attempted to answer the second question using hypotheticals. When that approach failed the trial court tried to explain the concept of aiding and abetting, accomplice liability and the requirement of corroboration in the context of Heather and Holguin being accomplices to the burglary.

Outside the presence of the jury the trial court commented the problem had surfaced because the defense had requested the instructions yet had failed to make any argument to the jury to explain how the instructions should be applied.

The next day the jury sent another note asking whether they had to return a unanimous verdict on the special circumstance and gun use allegations, or whether they could return a "split decision." The trial court told the jury each decision reached by the jury had to be unanimous.

The next morning the court and counsel discussed the probability one or more of the jurors was not convinced beyond a reasonable doubt appellant

personally did the shooting. The prosecutor pointed out the court's modified version of the instruction on the special circumstance finding only permitted a finding appellant personally robbed and shot the victim because the trial court had deleted the section describing the circumstances under which a true finding is permitted for a person who is not the actual killer. The court and counsel discussed the possible factual scenarios in which appellant might not have been the actual shooter. Finally the court concluded it had "overlooked all of the potential ramifications of the unexpressed argument by the defense that Heather Bishop and/or Gil Holguin could be not only the participant—the persons who committed the crimes, not just accomplices in the sense of advising or encouraging, but they were actually present at the scene of the crime and committed the crime."

The court noted the concept of aiding and abetting was introduced by the defense and not the prosecution. Thus in fairness to the prosecution the court determined to give the remaining portion of the special circumstance instruction in the event the jury was able to return verdicts on the substantive offenses but was hung on the special circumstance finding.

The jury reached guilty verdicts on the substantive offenses but were unable to reach decisions on the special circumstance or personal use of a firearm allegations. Based on the verdicts, the trial court said to the jury: "This means that each of you has found beyond a reasonable doubt that Effrage Davis was killed during the commission of the robbery charged in Count II. However, you have not been able to determine unanimously if the special circumstance charged in count I was true or not true.

"The logical conclusion to be drawn from this would be that some jurors are convinced beyond a reasonable doubt that the defendant personally shot Effrage Davis, and some are not. [¶] Is that conclusion accurate, Mr. [Foreman]?

"[Foreman]: Yes.

"THE COURT: That is the state of the jury's deliberations; correct?

"[Foreman]: Yes."

The court then instructed the jury, among other instructions, with CALJIC No. 8.80.1 regarding the special circumstance allegation, this time including the language permitting culpability as an aider and abettor.[5] After more than a day of deliberations, the jury found the special circumstance allegation true.

---

[5]This instruction provided as follows:

■ Appellant contends that because he had no notice he could be found guilty on a theory of aiding and abetting, he was denied due process and the effective assistance of counsel because counsel was unable to address this theory of culpability in closing arguments to the jury.

■ The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 15 of the California Constitution guarantee a criminal defendant the right to the effective assistance of counsel at all critical stages of the proceedings. (*United States* v. *Gouveia* (1984) 467 U.S. 180, 187 [81 L.Ed.2d 146, 153-154, 104 S.Ct. 2292]; *Coleman* v. *Alabama* (1970) 399 U.S. 1, 9-10 [26 L.Ed.2d 387, 396-397, 90 S.Ct. 1999].) To effectuate the constitutional rights to counsel and to due process of law, an accused must be informed of the crimes with which he is charged in order to have a reasonable opportunity to prepare a defense and respond to the charges. (*In re Oliver* (1948) 333 U.S. 257, 273 [92 L.Ed. 682, 694, 68 S.Ct. 499]; *Sheppard* v. *Rees* (9th Cir. 1989) 909 F.2d 1234, 1236.)

■ In support of his contention, appellant relies on the decision in *Sheppard* v. *Rees, supra,* 909 F.2d 1234. In *Sheppard,* the defendant was charged with murder and prosecuted on the theory the killing was premeditated, willful and deliberate. During the entire proceedings the concept of felony murder was never raised, either directly or indirectly. There was also no discussion of robbery or felony murder during discussions on instructions. The next morning, just prior to closing arguments, the prosecutor requested instructions on robbery and felony murder. (*Id.* at p. 1235.) The defendant objected, pointing out he had never been charged with robbery. Nevertheless, the trial court instructed the jury on a felony-murder theory and the prosecutor argued that theory to the jury during closing arguments. (*Id.* at p. 1236.)

---

"If you find the defendant in this case guilty of murder of the first degree, you must then determine if the following circumstance is true or not true:

"That the murder of Effrage Davis was committed by the defendant while the defendant was engaged in the commission of the crime of robbery.

"The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

"If you are satisfied beyond a reasonable doubt that the defendant actually killed a human being, you need not find that the defendant intended to kill in order to find the special circumstance to be true.

"If you find that the defendant was not the actual killer of a human being or if you are unable to decide whether the defendant was the actual killer of a human being, you cannot find the special circumstance to be true *unless you are satisfied beyond a reasonable doubt that the defendant, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree; or, with the reckless indifference to human life and as a major participant aided, abetted, counseled, commanded, induced, solicited, requested, or assisted in the commission of the crime of robbery, which resulted in the death of a human being, namely, Effrage Davis.*" (CALJIC No. 8.80.1, italics added.)

The Ninth Circuit found the defendant's right to due process and the effective assistance of counsel had been denied. "A trial cannot be fair unless the nature of the charges against a defendant are adequately made known to him or her in a timely fashion. . . . Here, the prosecutor 'ambushed' the defense with a new theory of culpability after the evidence was already in, after both sides had rested, and after the jury instructions were settled. This new theory then appeared in the form of unexpected jury instructions permitting the jury to convict on a theory that was neither subject to adversarial testing, nor defined in advance of the proceeding. [¶] Moreover, the right to counsel is directly implicated. That right is next to meaningless unless counsel knows and has a satisfactory opportunity to respond to the charges against which he or she must defend. . . ." (909 F.2d at p. 1237.) The court reversed the conviction, concluding it could not "regard as fair a trial in which the defendant's right to defend was impaired by a lack of notice as to the nature and cause of the accusation." (*Id.* at p. 1238; see also *People* v. *Stouter* (1904) 142 Cal. 146 [75 P. 780] [conviction reversed where after jury announced they could not reach a verdict trial court instructed for the first time they could find defendant guilty of an attempt to commit the crime instead].)

The situation in *Sheppard* is clearly distinguishable from the factual circumstances in the case at bar. In that case the defendant was not even charged with the crime of which he was possibly found guilty. In this case by contrast, there is no allegation appellant lacked notice of the substantive crimes with which he was charged. Nor is there any allegation the prosecution attempted to alter or add to these charges in any way.

Appellant also relies on the decision in *United States* v. *Gaskins* (9th Cir. 1988) 849 F.2d 454, a case more analogous to the case at bar. In *Gaskins* the defendant was charged with possession of methamphetamine and with manufacturing methamphetamine. During discussions on instructions the prosecutor requested an instruction on aiding and abetting. In response, defense counsel requested a special instruction on unanimity to inform the jurors their verdict had to be unanimous on the theory of the defendant's guilt—as a principal or as an aider and abettor. Ultimately counsel agreed with the trial court's decision not to give either instruction. (*Id.* at p. 456.)

During deliberations the jury sent the court a question suggesting they were considering an aiding and abetting theory of culpability on the count for manufacturing methamphetamine based on evidence the process occurred on the defendant's property. Over defense counsel's objection the trial court instructed on aiding and abetting. The court requested briefing on the issue whether the jury should be given a special unanimity instruction as well.

Defense counsel did not submit a proposed instruction but argued the supplemental instruction violated the Federal Rules of Criminal Procedure providing instructions should be settled prior to arguments. (Fed. Rules Crim.Proc., rule 30, 18 U.S.C. Appen.) Therefore, defense counsel requested an instruction on unanimity and sought leave to reopen closing arguments to address the aiding and abetting theory of culpability. The trial court denied both requests. (849 F.2d at pp. 456-457.)

The Ninth Circuit found the trial court's procedure violated the federal rule which requires counsel be informed of proposed instructions prior to closing arguments. "The object of the rule is to require the district court to inform the trial lawyers in a fair way what the instructions are going to be in order to allow counsel the opportunity to argue the case intelligently to the jury. [Citation.] Failure to comply with Rule 30 is reversible error, however, 'only if counsel's closing argument was prejudicially affected thereby.' [Citations.]" (849 F.2d at p. 458.) Under this rule a court will find prejudice "if the party was unfairly prevented from arguing his or her defense to the jury or was substantially misled in formulating and presenting arguments." (*Ibid.*)[6]

The Ninth Circuit reversed defendant's conviction because the aiding and abetting theory of culpability injected additional factual elements into the case which defense counsel did not have an opportunity to address in closing argument. "The government contends that there was no prejudice because

---

[6]Penal Code section 1093.5 directs the court and counsel to settle issues concerning jury instructions prior to closing argument. This provision is substantially similar in purpose and effect to rule 30 of the Federal Rules of Criminal Procedure and provides: "In any criminal case which is being tried before the court with a jury, all requests for instructions on points of law must be made to the court and all proposed instructions must be delivered to the court before commencement of argument. Before the commencement of the argument, the court, on request of counsel, must: (1) decide whether to give, refuse, or modify the proposed instructions; (2) decide which instructions shall be given in addition to those proposed, if any; and (3) advise counsel of all instructions given. However, if, during the argument, issues are raised which have not been covered by instructions given or refused, the court may, on request of counsel, give additional instructions on the subject matter thereof."

Appellant contends the court violated this section when it gave the additional instruction on the special circumstance finding in response to the jury's questions during deliberations and after closing argument. However, the rule when instructions must be given is not as rigid as appellant suggests and may be modified to address extraordinary situations. (See, *People* v. *Kronemyer* (1987) 189 Cal.App.3d 314, 341 [234 Cal.Rptr. 442] [purpose of rule is to give the parties an opportunity to intelligently argue the case to the jury].)

Penal Code section 1094 expressly authorizes a trial court to modify the procedure when necessary. This section provides: "When the state of the pleadings requires it, or in any other case, for good reasons, and in the sound discretion of the Court, the order prescribed in the last section (Pen. Code, § 1093.5) may be departed from." (See also *People* v. *Hill* (1992) 6 Cal.App.4th 33, 47 [8 Cal.Rptr.2d 123] [Penal Code section 1094 gives the court broad discretion to depart from the usual prescribed order of trial].)

Gaskin's counsel argued against an aiding and abetting theory during closing argument. We have read the transcript of her argument and disagree. Gaskin's counsel did not address the question whether providing a location for the laboratory, without more, would constitute aiding and abetting the manufacture of methamphetamine. Instead, her argument focused on the question whether her client had directly participated in the manufacturing process. Moreover, she did not argue the facts as they would relate to the principle that 'mere presence' at the scene of a crime and knowledge that a crime is being committed is not sufficient to establish that an accused aided and abetted, unless the prosecution proves beyond a reasonable doubt that the defendant was a participant, and not merely a knowing spectator. In addition, she could have argued that merely because the drugs were found in Gaskin's house does not mean that he possessed them or possessed them with the intent to distribute them and also does not necessarily mean that he aided Sanders' possession of the drugs. . . . '[W]e cannot conclude that "the effectiveness of counsel's argument and hence of appellant's defense" was not impaired by counsel's inaccurate information regarding the court's charge.' . . ." (849 F.2d at p. 460, citations omitted; see also *People* v. *Sanchez* (1978) 83 Cal.App.3d Supp. 1 [147 Cal.Rptr. 850] [reversal required because defense counsel's credibility was destroyed when the trial court changed an intended instruction in open court in front of the jury and in the middle of defense counsel's closing argument].)

In this case it is likely one or more jurors convicted appellant of the substantive crimes on the theory he was an indirect participant in the killing based on the aiding and abetting theory of culpability introduced into the case by the defense. Despite defense counsel's request for the instructions on accomplices and aiding and abetting, counsel did not argue this theory to the jury in closing argument or attempt to explain how the jury should apply the principles embodied in these instructions.

It is also probable one or more jurors found the special circumstance allegation true on the basis appellant was a major participant in the crimes but was not the actual shooter. This time instructions on appellant's potential culpability as an indirect participant were requested by the prosecution when the jury indicated it was hung during deliberations. At this point closing arguments had concluded and thus neither side had an opportunity to address this additional theory in closing arguments. The question remains whether "counsel's closing argument was prejudicially affected thereby," that is whether appellant "was unfairly prevented from arguing his . . . defense to the jury or was substantially misled in formulating and presenting arguments." (*United States* v. *Gaskins*, *supra*, 849 F.2d at p. 458.)

We note appellant does not claim or even suggest defense counsel would have changed his closing argument to address his potential culpability as an

aider and abettor. Appellant's defense was he had nothing to do with the crimes and in closing arguments urged the jury to adopt his version of the facts. In questioning by the trial court defense counsel tacitly acknowledged his intention in requesting the accomplice instructions in the first place. Counsel felt it was in appellant's best interests to present the accomplice theory of liability to the jury in the hopes one or more of the jurors would be convinced of Heather's and/or Holguin's guilt, but to avoid drawing attention to that theory or how it might apply to appellant by ignoring it in closing argument.

In addition, and more to the point, defense counsel did not request to reopen argument when the trial court stated its intention to instruct the jury they could find appellant guilty of the special circumstance allegation on an aiding and abetting theory. To the contrary. Defense counsel even expressed his desire for the court to submit the instructions to the jury with as little explanatory comment as possible.

In sum, defense counsel did not seek leave to reopen arguments to address this new theory of culpability on the special circumstance allegation. By failing to request additional argument to address this new theory of culpability, appellant has waived his objection to counsel's lack of opportunity to present an argument on the aiding and abetting special circumstance instruction. (See, e.g., *People* v. *Velez* (1983) 144 Cal.App.3d 558, 569 [192 Cal.Rptr. 686] [where prosecutor argued erroneous instruction during closing argument defendant waived error by refusing trial court's offer to reopen closing argument]; see also *People* v. *Newlun* (1991) 227 Cal.App.3d 1590, 1604-1605 [278 Cal.Rptr. 550] [claim of lack of notice of new evidence waived by failure to object or request continuance to prepare response to new evidence]; 6 Witkin & Epstein, Cal. Criminal Law (2d ed. 1989) Reversible Error, § 3289, pp. 4068-4069 ["A defendant may be precluded from raising an error as a ground of appeal where, by conduct amounting to acquiescence in the action taken, he waives the right to attack it."].)

Therefore, we cannot conclude appellant's counsel was "unfairly" prevented from arguing his defense or was "substantially misled" in presenting his arguments to the jury. (*United States* v. *Gaskins*, *supra*, 849 F.2d at p. 458.)

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 220.

IV.  *It Was Not Error to Deny Appellant's Motion to Suppress Evidence of the Plain Canvas Money Bag Found in a Search of His Home.*

Defense counsel moved to suppress evidence obtained during the November 6, 1992, warrantless search of his residence. At the suppression hearing, the evidence showed on October 9, 1992, Heather separated from appellant and moved out of their residence. The next day she returned with her stepfather and a rental truck to remove much of her and her children's clothing and furniture. She went to a battered women's shelter in Northern California.

On November 1, 1992, Heather went to the police and implicated appellant in the robbery/murder charged in this case. That evening police arrested appellant at his home. Appellant gave his consent for the police to search the residence.

On November 6, 1992, police contacted Heather and informed her they wanted to conduct another search at the house. She agreed because she wanted to remove additional property from the house and felt safer doing so while police were with her.

Appellant had changed the locks and Heather's key would not work. She climbed through the kitchen window to gain entry to the residence. She then opened the front door and let the officer in. Once inside the officer seized a white canvas money bag from appellant's bedroom.

The trial court found the officer could reasonably believe Heather had actual or apparent authority to consent to a search of her former residence. The court noted the factors which indicated Heather's consent may have been inadequate: she had left the residence three weeks earlier and appellant had changed the locks. The court then noted the factors indicating Heather retained dominion and control over the residence: Heather had left the house she shared with appellant for her own safety and went to a place of temporary shelter and not a permanent abode. She still had connections to the residence. It was her residence for purposes of voting and she was still liable for the rent, or for accidents occurring on the property. Most significant to the court's decision was the substantial amount of property—personal, community or belonging to the children—which she still had at the residence and removed while the officer conducting the search was present. Based on these facts the court concluded the officer could have reasonably believed Heather had at least apparent authority to consent to a search of the residence and denied appellant's motion to suppress evidence of the canvas money bag.

■ A search without a warrant is presumed to be illegal. (*People* v. *James* (1977) 19 Cal.3d 99, 106 [137 Cal.Rptr. 447, 561 P.2d 1135].) Once a defendant shows the search was warrantless, the burden shifts to the People to justify the search by establishing the search fell within an exception to the warrant requirement. (*Coolidge* v. *New Hampshire* (1971) 403 U.S. 443, 454-455 [29 L.Ed.2d 564, 575-576, 91 S.Ct. 2022].) One exception to the Fourth Amendment's warrant requirement is the defendant's voluntary consent to the search. (*People* v. *James, supra,* 19 Cal.3d at p. 106.) A third party's consent to a police search of the defendant's property is invalid unless that person has authority to consent to the search, or the police reasonably and in good faith believe she has such authority. (*People* v. *Jacobs* (1987) 43 Cal.3d 472, 481 [233 Cal.Rptr. 323, 729 P.2d 757]; *People* v. *Roman* (1991) 227 Cal.App.3d 674, 679 [278 Cal.Rptr. 44].)

"The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements . . . but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." (*United States* v. *Matlock* (1974) 415 U.S. 164, 171, fn. 7 [39 L.Ed.2d 242, 250, 94 S.Ct. 988].)

■ Appellant argues that, based on the facts known to the officer at the time of the search, he could not have reasonably believed Heather had the authority to consent to a search of the residence. He points out at the time of the search the officer knew Heather had moved out of the family residence three weeks earlier, taking with her many of her and her children's possessions. There was obvious hostility between Heather and appellant. She had reported appellant's crimes to the police, resulting in his arrest. Appellant had become physically abusive toward Heather and, fearful for her safety, Heather moved into a battered women's shelter. Appellant had changed the locks to the house so Heather had to climb through a window to enter the premises.

Regarding a wife's authority to consent to a police search in her own right despite antagonism between the spouses, the court in *Commonwealth* v. *Martin* (1970) 358 Mass. 282 [264 N.E.2d 366] noted: "The defendant argues further that in any event the wife's consent to a police search of the marital household premises should not make the search valid against the husband where, as in this case, there is obvious antagonism by the wife toward her husband. . . . Whatever bearing the existence or nonexistence of 'amicable relations' may have under a theory of a wife's implied authority to

consent to a search, it does not apply to a rule recognizing the wife's right to consent to the search of the marital household premises over which she has equal authority with her husband. While they are both living in the premises the equal authority does not lapse and revive with the lapse and revival of amicable relations between the spouses. The existence of antagonism by one spouse against the other may reveal motives for consenting to a search, and it may bear on the weight and credibility of any testimony given by the antagonistic spouse, but it does not change that spouse's position with reference to the right to give such consent." (*Commonwealth* v. *Martin*, *supra*, 358 Mass. 282, 289-290, [264 N.E.2d 366, 370], citing *In re Lessard* (1965) 62 Cal.2d 497, 504 [42 Cal.Rptr. 583, 399 P.2d 39], distinguished in *People* v. *Haskett* (1982) 30 Cal.3d 841, 856-857, fn. 5 [180 Cal.Rptr. 640, 640 P.2d 776].)

Regarding assumption of the risk by a defendant, at least one commentator suggests a defendant's expectation of privacy is, if anything, diminished because of the antagonism between him and a co-occupant. (3 LaFave, Search & Seizure (2d ed. 1987) Third Party Consent, § 8.3(b), pp. 242-245.) This could be especially true if, for example, the joint occupant is prompted to cooperate with the police because the defendant has committed a crime on that person. (See, e.g., *United States* v. *Lawless* (4th Cir. 1972) 465 F.2d 422 [defendant assaulted wife and out of concern for her safety she requested police assistance to find his gun in their shared trailer].)

Moreover, even a change in living arrangements may not vitiate an absent spouse's consent to a search if that spouse has a continuing property interest in the premises but was, in effect, forced out by the defendant. For example, in *United States* v. *Long* (9th Cir. 1975) 524 F.2d 660 the defendant's wife contacted the Federal Bureau of Investigation (FBI) and stated she had left the home she shared with her husband because she feared for her safety. She explained he had been buying guns, was storing explosives in their home and was planning to kill two federal judges. (524 F.2d at p. 661.)

Mrs. Long accompanied FBI agents and consented to a search of the house. Her keys no longer fit the locks so Mrs. Long and the FBI agents entered the premises by removing a window in a storage building next to the house. During this initial search the FBI seized guns the defendant had purchased under a false name. While police searched, Mrs. Long removed some of her personal possessions from the house. During a subsequent search to which Mrs. Long again consented, the FBI found additional guns. Mrs. Long again accompanied the officers to the house and removed additional items of personal property. (524 F.2d at p. 661.)

The defendant claimed his wife could not give a valid consent to search because she did not have joint access or control of the house within the

meaning of *United States* v. *Matlock, supra,* The court rejected this argument. "It cannot be convincingly argued that Mrs. Long as a joint owner of the house did not have the right to enter the house. Her husband was not her lessee who had the exclusive right of possession of the house. They had shared it until Mrs. Long was forced to leave due to her fear of her husband. Mrs. Long had a joint right to control the house with her husband and in fact exercised that right at the times she accompanied the agents to the house by collecting her personal belongings from the house while the agents were conducting the searches. Mrs. Long's consent was valid. [Citations.]" (524 F.2d at p. 661; accord, *United States* v. *Lawless, supra,* 465 F.2d 422 [wife's consent to search trailer occupied by her husband valid despite her intent to abandon the home and the fact she had no key and officers were forced to cut the screen to gain entry to the trailer]; but see *Illinois* v. *Rodriguez* (1990) 497 U.S. 177 [111 L.Ed.2d 148, 110 S.Ct. 2793] [girlfriend's consent to search defendant's residence was not valid because she had only visited premises when defendant was present and had never invited her friends there].)

The factual circumstances in *United States* v. *Long, supra,* are strikingly similar to those in the case at bar. Here Heather was forced out of the home she had shared with appellant out of fear for her safety. She moved to a temporary residence at a battered women's shelter after appellant had assaulted her and been physically abusive toward her. Appellant did not have exclusive right of possession of the house. They were still married and, at least at that point, appellant had no legal right to exclude her. (Cf. *Wisconsin* v. *Verhagen* (1978) 86 Wis.2d 262 [272 N.W.2d 105] [wife's consent was not valid where divorce orders had awarded searched premises to the defendant].) As appellant's spouse, she remained liable for the rent or for accidents occurring on the property despite her absence. And although Heather took a substantial amount of personal property out of the home in her initial move and intended to abandon the premises, a substantial amount of her and her children's property remained in the house at the time of the officer's subsequent search. The fact appellant had changed the locks to the house is indicative of the level of antagonism between Heather and appellant but is not determinative of Heather's continuing authority in her own right to consent to a search of the house. (*United States* v. *Long, supra,* 524 F.2d at p. 661; *United States* v. *Lawless, supra,* 465 F.2d at p. 423.)

Based on the foregoing facts and authorities, we conclude the trial court did not err in finding Heather had authority to consent to the search of their house on November 6, 1992. Accordingly, it was not error to admit evidence of the white canvas money bag found in appellant's bedroom and seized in the search.

V.   *Appellant Has Failed to Establish It Was Prejudicial Error to Admit Evidence He Had Repeatedly Referred to the Victim as a "Black Bitch."**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DISPOSITION

The judgment is affirmed.

Lillie, P. J., and Woods (Fred), J., concurred.

A petition for a rehearing was denied May 9, 1996, and appellant's petition for review by the Supreme Court was denied July 10, 1996.

---

*See footnote, *ante*, page 220.