[No. E016226. Fourth Dist., Div. Two. Feb. 26, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
VENTRICE LAJUAN LASTER et al., Defendants and Appellants.

**[Opinion certified for partial publication.†]**

---

†Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for partial publication with the exception of parts III.B, III.C.1, III.C.3, III.D.2, IV, V, VI, and VII.

COUNSEL

Charles R. Khoury, Jr., and John M. Bishop, under appointments by the Court of Appeal, for Defendants and Appellants.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Janelle B. Davis and Robert B. Shaw, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RICHLI, J.—Defendants Ventrice (Vince) Lajuan Laster and Frederick Hayes (collectively defendants) were convicted on four counts of deliberate

and premeditated attempted murder arising out of a drive-by shooting. Defendant Laster admittedly drove the car. Defendant Hayes admittedly was the passenger; the prosecution claimed Hayes was also the shooter. Defendants, however, claimed the shooting was the unplanned and unforeseen act of one of two mysterious passengers in the back seat. The prosecution accordingly argued that, even if neither defendant was the shooter, they were both liable for attempted murder on an aiding and abetting theory.

In this appeal, defendants contend that:

1. The jury instructions erroneously permitted the jury to find defendants guilty of attempted murder on the theory that it was a natural and probable consequence of the offense of discharging a firearm from a motor vehicle (Pen. Code, § 12034, subd. (d)), even though, on the facts of this case, the attempted murder and the discharge of a firearm consisted of the same act.

2. Aiding and abetting requires specific intent, and the trial court erred by failing to instruct accordingly.

3. The jury instruction on permitting the discharge of a firearm from a vehicle (Pen. Code, § 12034, subd. (b)) conflicted with the jury instruction on aiding and abetting.

4. Penal Code section 12034, subdivision (b), which defines the offense of permitting the discharge of a firearm from a vehicle, is unconstitutionally vague.

5. The jury instruction on permitting the discharge of a firearm from a vehicle (Pen. Code, § 12034, subd. (b)) was excessively vague.

6. The target offenses of discharging a firearm from a motor vehicle (Pen. Code, § 12034, subd. (d)) and permitting the discharge of a firearm from a vehicle (Pen. Code, § 12034, subd. (b)) are specific intent crimes, and the trial court erred by failing to instruct accordingly.

7. The trial court should have specified the mental state required to be guilty of permitting the discharge of a firearm from a motor vehicle (Pen. Code, § 12034, subd. (b)) by giving CALJIC No. 3.31.5 (1992 rev.) (5th ed. pocket pt.).

8. A defendant who aids and abets an attempted murder is not subject to the increased penalty for willful, deliberate, and premeditated attempted

murder (Pen. Code, § 664, subd. (a)) unless he or she *personally* deliberated and premeditated, and the trial court erred by failing to instruct accordingly.

9. The trial court erroneously failed to instruct that defendants could not be convicted of deliberate and premeditated attempted murder on an aiding and abetting theory unless the necessary mental state on the part of the perpetrator was a natural and probable consequence of the offense defendants intended to aid and abet.

10. The trial court erroneously failed to instruct on second degree attempted murder.

11. The trial court erroneously failed to instruct on attempted voluntary manslaughter.

12. The trial court erred by instructing the jury that it had to agree on whether defendants were guilty of attempted murder before it could consider lesser offenses ("*Kurtzman* error").

13. The jury instruction on the race enhancements (Pen. Code, § 422.75, subd. (c)) failed to define "in concert."

14. The jury instruction on the race enhancements (Pen. Code, § 422.75, subd. (c)) failed to require that a bias motivation have been a "cause in fact" of the crime.

15. The trial court erred by adding race enhancements (Pen. Code, § 422.75, subd. (c)) to indeterminate life terms.

We find no prejudicial error, and we will affirm.

I

FACTUAL BACKGROUND

On July 5, 1994, about 3 p.m., Venus Blankenship stopped at an ARCO station on University Avenue in Riverside to get gas. She was accompanied by her cousin Nominick Hayes and her two children.

Venus, with her children, went inside to pay; Nominick got out to pump the gas. There were four Hispanic males in a nearby car. One of them got out, came up to Nominick and said, "What the fuck you looking at[,] homes?" Nominick said, "What you talking about, man?" The man asked, "Are you one of them 1200?" Nominick took this to be a reference to the 1200 Block Crips. He answered, "No, I am not even from there."

A second Hispanic male came up, asked Nominick where he was from, then announced, "This is Tiny Dukes." A third Hispanic male rode into the gas station on a bicycle. He asked, "What the fuck you say to my homeboy?" Nominick replied, "I didn't say nothing. What you talking about?" Venus, who had been standing at the store entrance watching the confrontation, said, "I don't think he said anything. We will just leave."

At that point, the third man hit Nominick on the back of the head with a 40-ounce beer bottle. Nominick started running. The first man threw a bottle at Nominick which hit him in the leg. All three men started chasing him. Nominick ran to a construction site, where one of the workers called police.

Meanwhile, Venus drove to the courthouse, where she called her mother. She said some gang members had hit Nominick in the head with a bottle, and he had run off. She "may have" said they were Mexican. Venus also called the police. They told her Nominick was on the other phone, and gave her directions to the construction site. She drove back to look for Nominick, but she couldn't find him. About 5:30 p.m., she went to her mother's house.

Venus's mother, Francetta Hayes, lived on Hemlock Street in Moreno Valley, with Venus's sisters, Cherie Mays and Darlena Mays. Defendant Laster was Cherie's fiancé. Venus's cousin, defendant Frederick Hayes, was staying at the house on Hemlock while visiting from Detroit.

Around 5 or 6 p.m., before Venus got home, Cherie let defendants take her maroon car to go look for Nominick. Around 5:50 or 6 p.m., they returned to the house. Two other people were with them. Venus's mother went out to the car and talked to defendants. Defendants left for about 10 minutes, then came back alone.

Virginia Duenas was at Sixth and Franklin, along the east side of Longfellow Elementary School. She heard screeching tires; then she saw Cherie's maroon car. It was swerving and turning "crazy like." There were three or four Black males in it. Duenas took down the license plate number.

About 6:55 p.m., the maroon car was on Eucalyptus Avenue, along the west side of Longfellow Elementary School, next to the basketball courts. There were about 30 people in the basketball area. One was Black; the rest were Hispanic. Perhaps two of them were dressed like "gang bangers," with "saggy pants." Ten of them were children.

The basketball area was surrounded by a fence; a gate in the fence opened directly onto a crosswalk at Seventh and Eucalyptus. There was a stop sign

on the south side of the crosswalk. The maroon car stopped in the middle of the crosswalk. Witnesses saw four Black men inside. One of the men fired about 20 shots, in 2 bursts, through the gate and into the basketball area.

According to Richard Guzman, who was playing basketbal, the shots came from the front passenger window; he could see the flashes. Seven-year-old Albert Gonzalez also testified that the shots were fired from the front passenger window.

The gunfire struck four people. Two-year-old Anna Gonzalez, Albert's sister, was hit in the head. Joseph Romero was shot in the abdomen. Arturo Marquez was shot in the back, and Augustine Cervantes Sanchez was shot in the leg.

About 7:30 or 8 p.m., Nominick called the house on Hemlock. He said he was at Laster's mother's house. Defendants took Venus's car and went to pick him up.

Police traced the license number Virginia Duenas had taken down to the house on Hemlock. Around 10 p.m., Riverside Police Detective Ron Sanfilippo and other officers went there. The maroon car was outside. At about the same time, Hayes and Nominick walked up. The police questioned them briefly. Hayes denied having gone to Riverside.

Sanfilippo went in and told Cherie her car had been used in a shooting in Riverside earlier that day. She told him that around 5:30 p.m., she had lent the car to Vince and Fred. At first, she claimed she didn't know their last names or where they lived. Laster, however, walked into the room; Sanfilippo asked him his name, and he said he was Vince. Cherie then admitted he was her boyfriend.

Sanfilippo also interviewed Venus. She told him about the attack on Nominick. She said that afterward, she spoke to Hayes on the phone and told him some Mexican males had hit Nominick over the head with a bottle at a gas station.

Sanfilippo took both defendants back to the station. They waived their *Miranda* rights and agreed to be interviewed.

Hayes said he been out to Lake Perris with some friends. When he got back, he heard that some Mexicans had attacked Nominick in Riverside. He and Laster then took Cherie's car to go into Riverside. Laster was driving; Hayes was in the front passenger seat. On the way, they stopped at a grocery

store and picked up two other Black males. These were introduced to Hayes as "homie or home boy or something." Hayes thought Laster knew them, but wasn't sure if he knew their names. Hayes gave Sanfilippo a description of them. The two men got into the backseat. They all then went to Riverside to look for Nominick.

Hayes admitted that before they got to Riverside, he knew there was a gun in the car. At first he said they went somewhere to get a gun; then he changed his story, and said one of the two men got into the car with the gun.

They ended up by Longfellow Elementary School. Hayes saw Mexicans standing around on the school grounds. The car stopped in the middle of the crosswalk, and one of the men in back began shooting. Hayes was taken by surprise. He claimed he didn't know what happened afterward to the two men or to the gun.

Hayes explained that he lied at first because "I was in the car and I know I was in the car." Sanfilippo admitted that Hayes "was pretty upset that a two-year-old girl got shot." Hayes told him, "I know what I did. I messed up. God is, you know, real, and I messed up."

When Laster was first interviewed, he denied everything. After the officers had spoken to Nominick, however, they reinterviewed Laster. This time, he admitted that he was driving the maroon car; Hayes was in the front passenger seat. They had gone to Riverside to look for Nominick. They had picked up two other Black males, one in Moreno Valley, and one in Riverside. Laster indicated that he knew who they were, but he wasn't going to give up their names. He referred to one as a "friend I know for a long time." He said one was nicknamed "Skee"; he claimed he didn't know the other one's name. The two men rode in the backseat. One of them did the shooting. Afterwards, he dropped the two men off. Laster, too, claimed he didn't know what happened to the gun.

Police found nineteen .22-caliber shell casings scattered around the rear seat area of the maroon car. A criminalist testified that they were probably fired from a semiautomatic weapon, which would have ejected shells to the right and backward. There were no usable fingerprints on the shell casings.

Both defendants testified at trial. Hayes testified that he and Laster had spent the afternoon at Lake Perris with some friends. About 5:30 p.m., they got back to the house on Hemlock. There he heard that some Mexicans had hit Nominick in the head with a bottle at an ARCO station in Riverside, and no one knew where he was.

About 5:40 p.m., Hayes and Laster took Cherie's car to go look for Nominick. Laster was driving; Hayes was in the front passenger seat. First, they went to an area of apartment buildings and grocery stores in Moreno Valley. Laster got out of the car and went out of Hayes's sight. Three to five minutes later, he came back with "two gentlemen" who got into the back seat of the car. Hayes didn't know them; they weren't introduced to him. One of them had a long black gun stuck in his pants.

They drove into Riverside, then drove around looking for Nominick for about 10 minutes. Nobody in the car said anything. As they neared the crosswalk at the school, someone in the back said, "Stop." Laster stopped the car at the stop sign. The "gentlemen" in the back seat were "talking amongst themselves." Hayes admitted telling police that someone in the car said, "There's the Mexicans." "There's those eses.[1] They're the ones that got your cousin." At trial, however, he could only remember that they said "something about eses." At that point, the man behind Hayes began firing out the back window. Hayes ducked, then turned around and saw the man firing. Laster drove away; as he did, the man was still firing. Laster said, "You guys shouldn't have done that."

They drove back to the house on Hemlock. Hayes got out; Laster and the two men left. Later, Laster returned alone. Hayes didn't tell anyone in the house what had happened.

Laster testified that when he and Hayes got home from Lake Perris, Francetta Hayes told him Nominick had been hit in the back of the head with a bottle by "some guys" at an ARCO station in Riverside. No one told him they were Hispanic; that Tiny Dukes were involved; or that they had accused Nominick of being a 1200 Block Crip.

Laster and Hayes took Cherie's car to go looking for Nominick, along with two other men whom Laster described as "some friends of mine[] that I've known for about three or four hours out of my whole life." He had met them the day before, at a shopping center. He remembered telling Sanfilippo one was named "Skeet" or "Fleet." He explained that he took them along because "I was afraid . . . of going up there with just me and Frederick Hayes." He picked them up at the shopping center. He admitted telling Sanfilippo he picked one of them up in Riverside, but he claimed that was a lie. He never saw that they had a gun.

They drove around Riverside looking for Nominick. There was no discussion in the car. At the school, Laster made a legal stop at the stop sign. He

---

[1]Detective Hector Heredia testified that "ese" was a "street term " used to greet a Hispanic person. He translated it as "dude." In the transcript, it is consistently misspelled as "esse"; we will substitute the correct spelling.

denied that anyone told him to stop. He also denied hearing the men in back talking about "eses." Then he heard shots. At first, he didn't know where they were coming from. He looked all around; when he looked behind him, he saw "the guy in the right rear shooting." He yelled, "what the [fuck] are you doing?", then took off. Nobody in the car spoke. He went straight back to Hemlock, dropped Hayes off, then took the two men back to where he had picked them up and returned to Hemlock.

Laster claimed he lied to Sanfilippo initially because he was afraid; Sanfilippo told him he was going to spend the rest of his life in the penitentiary.

## II

### Procedural Background

On July 8, 1994, a felony complaint was filed against defendants. After they were held to answer, an information was filed charging them with four counts of attempted murder. (Pen. Code, §§ 187, 664.) In connection with each count, it was alleged that: (1) defendants committed the offenses because of the victim's race, color, religion, nationality, country of origin, or ancestry, and while acting in concert with another person (former Pen. Code, § 422.75, subd. (b); now Pen. Code, § 422.75, subd. (c)) (hereafter race enhancements); (2) defendant Hayes intentionally inflicted great bodily injury (Pen. Code, § 12022.7, subd. (a)) (hereafter great bodily injury enhancements); (3) defendant Hayes personally used a firearm (Pen. Code, § 12022.5, subd. (a)) (hereafter personal firearm use enhancements); and (4) defendant Laster was vicariously armed with a firearm (Pen. Code, § 12022, subd. (d)) (hereafter vicarious arming enhancements).

After a jury trial, defendants were found guilty on all four counts; the jury found that the attempted murders were willful, deliberate, and premeditated. The jury found true the race enhancements against both defendants, and the vicarious arming enhancements against Laster; it was unable to reach a verdict on the great bodily injury enhancements and personal firearm use enhancements against Hayes.

On May 5, 1995, Laster was sentenced to four consecutive indeterminate life terms, with the possibility of parole, plus three years (the midterm) on each of the race enhancements, plus two years (the midterm) on each of the vicarious arming enhancements, for a total determinate term of twenty years, to be served consecutively.

Also on May 5, 1995, Hayes was sentenced to four consecutive indeterminate life terms, with the possibility of parole, plus three years on each of

the race enhancements, for a total determinate term of twelve years, to be served consecutively. The trial court struck the great bodily injury and personal firearm use enhancements on which the jury had been unable to agree.

## III

### THE AIDING AND ABETTING INSTRUCTIONS

Defendants raise numerous contentions relating to the jury instructions on aiding and abetting. We therefore discuss here some of the legal and factual background of these contentions.

■ "[A]n aider and abettor is a person who, 'acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime.' [Citation.]" (*People* v. *Prettyman* (1996) 14 Cal.4th 248, 259 [58 Cal.Rptr.2d 827, 926 P.2d 1013], quoting *People* v. *Beeman* (1984) 35 Cal.3d 547, 561 [199 Cal.Rptr. 60, 674 P.2d 1318]; accord, *People* v. *Cooper* (1991) 53 Cal.3d 1158, 1164 [282 Cal.Rptr. 450, 811 P.2d 742].)

" '[An aider and abettor] is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets. . . . [¶] It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. His knowledge that an act which is criminal was intended, and his action taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed as a consequence by the perpetrator. It is the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense, which . . . must be found by the jury.' [Citation.] Thus, . . . a defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet (the target crime), but also for any other crime that is the 'natural and probable consequence' of the target crime." (*People* v. *Prettyman, supra,* 14 Cal.4th at p. 261, quoting *People* v. *Croy* (1985) 41 Cal.3d 1, 12, fn. 5 [221 Cal.Rptr. 592, 710 P.2d 392].)

When this case was tried, it was unclear whether the jury had to be instructed on the elements of the crime the defendant intended to aid and abet (sometimes called the "target," "predicate," or "underlying" offense), in

addition to the elements of the charged crime. (Compare *People* v. *Solis* (1993) 20 Cal.App.4th 264, 269-276 [25 Cal.Rptr.2d 184] [trial court is not required to instruct the jury on the elements of an uncharged target offense], cert. den. (1994) 513 U.S. 843 [115 S.Ct. 133, 130 L.Ed.2d 75] with *People* v. *Mouton* (1993) 15 Cal.App.4th 1313, 1318-1320 [19 Cal.Rptr.2d 423] [trial court erred by failing to instruct the jury sua sponte on the elements of uncharged target offenses]; see *People* v. *Prettyman*, *supra*, 14 Cal.4th at pp. 264-270 [adopting Mouton rule that jury must be instructed on elements of target offense; disapproving *Solis*].)

In this case, the prosecution, to be on the safe side, chose to rely on certain specified target offenses, and requested jury instructions on the elements of these target offenses. However, again to be on the safe side, it selected target offenses with the fewest possible elements, so that they would be the easiest to prove: (1) discharging a firearm from a vehicle (Pen. Code, § 12034, subd. (d)), and (2) permitting the discharge of a firearm from a motor vehicle (Pen. Code, § 12034, subd. (b)). The prosecution then took the position that defendants had knowingly and intentionally aided and abetted the commission of one or the other, or both, of these target offenses; that it was reasonably foreseeable that, as a consequence, the perpetrator would commit attempted murder; and hence that defendants were guilty of attempted murder.

The following contentions spring from this background.

A. *Aiding and Abetting Liability Where the Target Offense Consists of the Same Act as the Actual Offense.*

Defendants contend that the instructions erroneously permitted the jury to find that the actual offense of attempted murder was a natural and probable consequence of the target offense of discharging a firearm from a motor vehicle. They argue that, on the facts of this case, the attempted murder and the discharge of the firearm were the same act (distinguished only by the perpetrator's state of mind), so that one cannot be the "consequence" of the other. They conclude that they were deprived of a jury determination on whether they had the necessary mental state to be guilty of attempted murder.

We must reject this argument, because we cannot see (and defendants do not suggest) why the fact that the target offense and the offense ultimately committed by the perpetrator consisted of the same act lessened defendants' culpability.

We readily concede that most often, where the target offense differs from the crime actually committed so that it is necessary to instruct on the

"natural and probable consequences" rule, the target offense and the actual offense consist of different acts. (E.g., *People* v. *Bishop* (1996) 44 Cal.App.4th 220, 228-235 [51 Cal.Rptr.2d 629] [defendant convicted of murder as a natural and probable consequence of burglary and robbery which he aided and abetted].) Accordingly, the usual formulation of the "natural and probable consequences" test looks to whether the actual offense is a "consequence" of the target offense. (E.g., *People* v. *Prettyman, supra,* 14 Cal.4th at p. 261 ["[A] defendant may be held criminally responsible as an accomplice not only for the crime he or she intended to aid and abet . . . . , but also for any other crime that is the 'natural and probable consequence' of the target crime."].)

Defendants, for their part, also concede that in some cases, the target offense and the actual offense may consist of the same act *by the perpetrator*; for example, where the aider and abettor intends to facilitate an assault with a deadly weapon, but the perpetrator commits a murder. (See, e.g., *People* v. *Francisco* (1994) 22 Cal.App.4th 1180, 1189-1191 [27 Cal.Rptr.2d 695]; see also *People* v. *Bunyard* (1988) 45 Cal.3d 1189, 1231-1232 [249 Cal.Rptr. 71, 756 P.2d 795].) They argue, however, that even in such a case, ". . . a further physical act, the killing of the victim, must be proved. It is this subsequent event, the victim being struck by the gunfire so as to cause his death, that permits the inference that the victim's murder was a foreseeable *consequence* of the shooting . . . ." Here, where the target offense is discharging a firearm from a vehicle, and the actual offense committed by the perpetrator is *attempted murder*, the target offense and the actual offense are distinguished solely by the perpetrator's state of mind.[2]

We fail to see, however, why the aider and abettor should be any less culpable in this situation. If anything, he should be *more* culpable. Rather than intentionally facilitating one criminal act which resulted in the charged criminal act (e.g., a robbery which resulted in an attempted murder), he has intentionally facilitated the charged criminal act itself (e.g., an assault which was in fact an attempted murder).

We believe defendants have misinterpreted the usual formulation of the "natural and probable consequences" test. They assume that the perpetrator must actually commit the criminal act which the aider and abettor intentionally aids and encourages. We believe that, to the contrary, the aider and

---

[2]It could be argued that discharging a weapon from a vehicle and attempted murder are distinguished by a "further physical act"—the presence of a victim. However, while true in this case, this is not necessarily true. One can imagine a case in which the perpetrator commits attempted murder by shooting, with intent to kill, at a tree which he thinks is a person. Thus, we choose to rest our opinion on broader grounds.

abettor may be liable where he intentionally aids and encourages one criminal act, but the perpetrator actually commits some other, more serious, criminal act. Thus, the real question is not whether the actual offense was a consequence of the target offense; it is whether the charged crime was a consequence of *the aider and abettor's facilitation* of the target offense.

Some formulations of the "natural and probable consequences" test support our interpretation. For example, in *People* v. *Croy, supra,* 41 Cal.3d 1, the Supreme Court stated: "It follows that a defendant whose liability is predicated on his status as an aider and abettor need not have intended to encourage or facilitate the particular offense ultimately committed by the perpetrator. *His knowledge* that an act which is criminal was intended, and *his action* taken with the intent that the act be encouraged or facilitated, are sufficient to impose liability on him for any reasonably foreseeable offense committed *as a consequence* by the perpetrator." (*Id.,* at p. 12, fn. 5, italics added.)

Our interpretation is also consistent with the historical development of the "natural and probable consequences" test. It originated in the "legal fiction" that one intends the natural and probable consequences of his own acts. (*People* v. *Garewal* (1985) 173 Cal.App.3d 285, 301 [218 Cal.Rptr. 690]; see also *People* v. *Oliver* (1989) 210 Cal.App.3d 138, 151 [258 Cal.Rptr. 138]; *People* v. *Wade* (1945) 71 Cal.App.2d 646, 652 [163 P.2d 59].) Thus, proof of the aider and abettor's intent to commit the actual offense is excused if the actual offense was a natural and probable consequence of *his acts* of aiding and abetting.[3]

Defendants claim the vice of the jury instruction in this case was that "[t]he attempted murder could only have been the shooting, rendering the question of foreseeability superfluous—its answer a foregone conclusion under the court's charge." We disagree. Assuming the jury found that defendants knowingly and intentionally aided and abetted the discharge of a firearm from a vehicle, it still had to determine whether attempted murder was a natural and probable consequence. This required it to consider whether it was reasonably foreseeable that the perpetrator harbored an intent to kill. The fact that the target offense and the actual offense consist of the same act does not necessarily render the actual offense foreseeable. For example, if the perpetrator had told defendants he only had a BB gun, and he intended to

---

[3]Defendants understandably rely on *People* v. *Rogers* (1985) 172 Cal.App.3d 502 [217 Cal.Rptr. 809], in which the court, in a footnote, opined: "[I]f the test of aiding and abetting were to include the natural and probable consequences of the *act of aid* rather that the acts (offenses) aided, the intent requirement of *Beeman* would be emasculated." (*Id.,* at p. 515, fn. 18.) The truth of this proposition is not self-evident. Moreover, it was dictum, unnecessary to the court's decision. We therefore respectfully disagree.

fire it into the air just to frighten people at the school, the jury could well have found that defendants could not foresee the commission of attempted murder.

We conclude that it was appropriate to instruct the jury on the "natural and probable consequences" rule.

**B.** *Failure to Instruct on Aiding and Abetting as a Specific Intent Crime.**

. . . . . . . . . . . . . . . . . . . . . . . . . .

**C.** *Jury Instructions on the Target Offenses.*

**1.** *Conflict With the Aiding and Abetting Instructions.**

. . . . . . . . . . . . . . . . . . . . . . . . . .

**2.** *Whether "Permit" (Pen. Code, § 12034, Subd. (b)) Is Unconstitutionally Vague.*

██ Defendants contend that the use of "permit" in Penal Code section 12034, subdivision (b) renders it void for vagueness.

██ "To satisfy the constitutional command, a statute must meet two basic requirements: (1) The statute must be sufficiently definite to provide adequate notice of the conduct proscribed; and (2) the statute must provide sufficiently definite guidelines for the police in order to prevent arbitrary and discriminatory enforcement. [Citations.]" (*Tobe* v. *City of Santa Ana* (1995) 9 Cal.4th 1069, 1106-1107 [40 Cal.Rptr.2d 402, 892 P.2d 1145].) " ' "[I]t cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' " (*Id.,* at p. 1107, quoting *Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 143 [253 Cal.Rptr. 1, 763 P.2d 852], cert. den. (1989) 491 U.S. 905 [109 S.Ct. 3186, 105 L.Ed.2d 695].)

Recently, in *People* v. *Heitzman* (1994) 9 Cal.4th 189 [37 Cal.Rptr.2d 236, 886 P.2d 1229], the Supreme Court rejected a void-for-vagueness challenge to Penal Code section 368, subdivision (a), which makes it a crime for "[a]ny person" to "permit[]" an elder or a dependent adult to suffer under circumstances likely to produce great bodily harm or death. The defendant's liability was predicated on "her failure to act, i.e., her failure to prevent the infliction of abuse on her father." (9 Cal.4th at p. 197, italics omitted.) The

*See footnote, *ante*, page 1450.

court recognized that "when an individual's criminal liability is based on the *failure* to act, it is well established that he or she must first be under an existing legal duty to take positive action. [Citations.]" (*Id.*, at pp. 197-198.) "A legal duty to act is often imposed by the express provisions of a criminal statute itself." (*Id.*, at p. 198.) "When a criminal statute does not set forth a legal duty to act by its express terms, liability for a failure to act must be premised on the existence of a duty found elsewhere." (*Ibid.*)

The court held that Penal Code section 368, subdivision (a), if construed literally so as to impose criminal liability for failure to act on "[a]ny person," would be excessively vague. (*People* v. *Heitzman, supra*, 9 Cal.4th at pp. 193, 200, 205, 209.) Thus, it construed it instead as imposing such liability only on those who, under existing tort principles, had a duty to control the conduct of the person who caused the elder or dependent adult to suffer. (*Id.*, at pp. 194, 212-214.) As so construed, the statute was not unconstitutionally vague. (*Id.*, at p. 214.)

Defendants do not specify what in particular they believe is vague about Penal Code section 12034, subdivision (b). The statute itself defines the class of persons who have a duty to act: drivers and owners of vehicles. It therefore imposes a legal duty on such drivers and owners to prevent the discharge of firearms from their vehicles. Obviously, a driver or owner can be held criminally liable for affirmatively assenting to, or authorizing the discharge; but he or she can also be held criminally liable for failing to prevent the discharge (provided, of course, he or she had the power or ability to prevent it). Finally, the statute imposes criminal liability only where the driver or owner "knowingly" permits the discharge. Thus, it is not vague with respect to the necessary mental state.

We conclude that Penal Code section 12034, subdivision (b), as so construed, is not unconstitutionally vague.

3. *The Adequacy of the Jury Instruction on Permitting the Discharge of a Firearm From a Vehicle.*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . .

4. *Failure to Instruct on the Target Offenses as Specific Intent Crimes.*

Defendants contend that both target offenses were specific intent crimes, and the trial court erred by failing to instruct accordingly.

---

\*See footnote, *ante*, page 1450.

■ " 'When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intent is deemed to be a general criminal intent. When the definition refers to defendant's intent to do some future act or achieve some additional consequence, the crime is deemed to be one of specific intent.' " (*People* v. *Davis* (1995) 10 Cal.4th 463, 519, fn. 15 [41 Cal.Rptr.2d 826, 896 P.2d 119], cert. den. (1996) __ U.S. __ [116 S.Ct. 932, 133 L.Ed.2d 859], quoting *People* v. *Hood* (1969) 1 Cal.3d 444, 456-457 [82 Cal.Rptr. 618, 462 P.2d 370].)

Except in those rare circumstances where strict criminal liability may be imposed, even a general intent crime ordinarily requires scienter, i.e., guilty knowledge of the facts which make the act a crime. (See generally, Pen. Code, § 20; *People* v. *Simon* (1995) 9 Cal.4th 493, 519-522 [37 Cal.Rptr.2d 278, 886 P.2d 1271]; *People* v. *Telfer* (1991) 233 Cal.App.3d 1194, 1198-1204 [284 Cal.Rptr. 913]; *People* v. *Lopez* (1986) 188 Cal.App.3d 592, 597-600 [233 Cal.Rptr. 207].) A knowledge requirement, however, is distinct from a specific intent requirement. (*People* v. *Cleaves* (1991) 229 Cal.App.3d 367, 380 [280 Cal.Rptr. 146]; *People* v. *Lopez, supra*, 188 Cal.App.3d at pp. 596-597; *People* v. *Calban* (1976) 65 Cal.App.3d 578, 584 [135 Cal.Rptr. 441].)

■ The offense of discharging a firearm from a motor vehicle (Pen. Code, § 12034, subd. (d)) is committed by doing the proscribed act; there is no statutory requirement that the defendant intend to bring about any particular result. It is manifestly a general intent crime.

The offense of permitting another to discharge a firearm from a vehicle (Pen. Code, § 12034, subd. (b)) likewise is committed merely by doing the proscribed act. This follows from the statute's use of the term "knowingly." While the defendant must know someone else is discharging a firearm from a vehicle, there is no requirement that the defendant must intend the discharge.

Defendants argue that "permitting" the discharge implies intending the discharge. However, one may knowingly assist another to commit a crime, yet lack a specific intent that the crime be committed (*People* v. *Beeman, supra*, 35 Cal.3d at pp. 558-559); a fortiori, one may knowingly permit another to discharge a firearm, yet lack a specific intent that the firearm be discharged. Defendants also rely on cases holding that a "use" of a firearm does not include a negligent or involuntary use. (*People* v. *Chambers* (1972) 7 Cal.3d 666, 672-674 [102 Cal.Rptr. 776, 498 P.2d 1024] [firearm use

enhancement under Pen. Code, § 12022.5]; *People* v. *Southack* (1952) 39 Cal.2d 578, 591-592 [248 P.2d 12] [eligibility for probation under Pen. Code, § 1203].) Here, however, the requirement that the defendant "knowingly" permit the discharge of the firearm equally excludes a negligent or involuntary "permission."

Defendants alternatively contend that, if permitting the discharge of a firearm from a vehicle is not a specific intent crime, the trial court should have specified the required mental state by giving CALJIC No. 3.31.5 (1992 rev.) (5th ed. pocket pt.). Defendant Hayes initially requested this instruction; later, however, both defendants agreed, on the record, that it was unnecessary. Accordingly, any error was invited. (*People* v. *Johnson* (1993) 6 Cal.4th 1, 49 [23 Cal.Rptr.2d 593, 859 P.2d 673], cert. den. (1994) 513 U.S. 844 [115 S.Ct. 133, 130 L.Ed.2d 76]; *People* v. *Cooper* (1991) 53 Cal.3d 771, 830-831 [281 Cal.Rptr. 90, 809 P.2d 865].)

In any event, we do not believe the trial court erred. CALJIC No. 3.31.5 gives a court two options; it may specify the mental state required for each crime, or it may simply instruct that: "The mental state[s] required [is] [are] included in the definition[s] of the crime[s] set forth elsewhere in these instructions." Here, the separate instruction defining the crime included the requirement that the defendant act "knowingly." There was no need to restate this in CALJIC No. 3.31.5.

D. *Instructions on Willful, Deliberate, and Premeditated Murder (Pen. Code, § 664, subd. (a)).*

1. *Applicability to an Aider and Abettor.*

Defendants contend that one who aids and abets an attempted murder is not subject to the increased penalty for willful, deliberate, and premeditated attempted murder (Pen. Code, § 664, subd. (a)) unless he or she *personally* deliberated and premeditated; and that the trial court erred by failing to instruct accordingly.

Penal Code section 664 provides that: "Every person who attempts to commit any crime . . . is punishable . . . as follows: [¶] (a) If the offense so attempted is punishable by imprisonment in the state prison, the person guilty of that attempt is punishable by imprisonment in the state prison for one-half the term of imprisonment prescribed upon a conviction of the offense so attempted; provided, however, that *if the crime attempted is*

*willful, deliberate, and premeditated murder, . . . the person guilty of that attempt shall be punishable by imprisonment in the state prison for life with the possibility of parole*; provided, further, that if the crime attempted is any other one in which the maximum sentence is life imprisonment or death the person guilty of the attempt shall be punishable by imprisonment in the state prison for a term of five, seven, or nine years." (Italics added.)

Recently, in *People* v. *Bright* (1996) 12 Cal.4th 652 [49 Cal.Rptr.2d 732, 909 P.2d 1354], cert. den. __ U.S. __ [116 S.Ct. 2527, 135 L.Ed.2d 1051], the Supreme Court held that "the provision in [Penal Code] section 664, subdivision (a), imposing a greater punishment for an attempt to commit a murder that is 'willful, deliberate, and premeditated' does not create a greater degree of attempted murder but, rather, constitutes a penalty provision . . . ." (*Id.*, at p. 656; see also 12 Cal.4th at pp. 665-669.)

Defendants rely on a series of Supreme Court cases which held that an aider and abettor could not be vicariously subject to particular penalty provisions. First, in *People* v. *Walker* (1976) 18 Cal.3d 232 [133 Cal.Rptr. 520, 555 P.2d 306], the Supreme Court held that a defendant is not subject to a firearm use enhancement (former Pen. Code, § 12022.5)[6] unless he or she personally used the firearm; aiding and abetting the use of a firearm was not enough. (18 Cal.3d at pp. 240-242.) It stated: "Generally, if a statute is intended to impose a derivative liability on some person other than the actor, there must be some legislative direction that it is to be applied to persons who do not themselves commit the proscribed act. Such a direction is found in section 31 which fixes responsibility on an aider and abettor for a crime personally committed by a confederate. But the statute which defines aiders and abettors as principals in the commission of a criminal offense does not also purport to impose additional derivative punishment grounded on an accomplice's personal conduct, as those statutes which provide for such increased punishment ' "do not define a crime or offense but relate to the penalty to be imposed under certain circumstances." ' [Citations.] Hence the rules which make an accused derivatively liable for a crime which he does not personally commit, do not at the same time impose a derivatively increased punishment by reason of the manner in which a confederate commits the crime." (*People* v. *Walker, supra*, 18 Cal.3d at pp. 241-242, quoting *People* v. *Strickland* (1974) 11 Cal.3d 946, 961 [114 Cal.Rptr. 632, 523 P.2d 672], quoting *People* v. *Provencher* (1973) 33 Cal.App.3d 546, 550 [108 Cal.Rptr. 792].)

---

[6]The enhancement applied to: " 'Any person who uses a firearm in the commission or attempted commission of a robbery, assault with a deadly weapon, murder, assault with intent to commit murder, rape, burglary, or kidnapping, upon conviction of such crime . . . .' " (*People* v. *Walker, supra*, 18 Cal.3d at p. 236, fn. 1, quoting former Pen. Code, § 12022.5.)

"As section 12022.5 does not expressly direct its application to particular persons or classes of persons we must otherwise determine the legislative intent." (*People* v. *Walker, supra,* 18 Cal.3d at p. 240.) "We have heretofore construed section 12022 and other sections enhancing criminal penalties for being armed . . . as limited in their application *only* to those persons convicted of felonies who were *personally armed* [citation], and certainly we cannot now discern in the foregoing legislative history of section 12022.5 any intent to apply that section differently." (*Id.,* at p. 241.)

Finally, the court stated that: "Our conclusion . . . is also compelled by the established policy 'to construe a penal statute as favorably to the defendant as its language and the circumstances of its application reasonably permit; . . . the defendant is entitled to the benefit of every reasonable doubt as to the true interpretation of words or the construction of language used in a statute.' " (*People* v. *Walker, supra,* 18 Cal.3d at p. 242, quoting *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 631 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

Later, the Supreme Court held that the enhancement for a prior conviction of a felony "in which the defendant uses a firearm" (former Pen. Code, §§ 667, 1192.7, subd. (c)(8)),[7] applied only if the prior felony required *personal* firearm use. (*People* v. *Piper, supra,* 42 Cal.3d 471, 476-477.) Again, it treated the question as a matter of statutory interpretation. (*Ibid.*) It concluded that: "Since Walker, the Legislature has been quite explicit when it intends an enhancement provision to apply to a defendant even though he himself does not commit the proscribed act. . . . [¶] Subdivision (c)(8), of course, contains no similar language indicating that it was intended to apply even when the defendant himself did not personally use a firearm. Accordingly, the principle of interpretation applied in *Walker* supports the conclusion that the subdivision should be construed to apply only to defendants who personally use a firearm in the commission of a felony." (*Id.,* at p. 477.)

Thus, there is no absolute rule against vicarious or derivative application of an enhancement or other penalty provision. At most, there is a presumption against it. The issue remains one of statutory interpretation, however, and, if there is a sufficient indication of legislative intent, an enhancement may be construed as applying vicariously to an aider and abettor. For

---

[7]The enhancement applied to " '[a]ny person convicted of' " " 'any . . . felony in which the defendant inflicts great bodily injury on any person, other than an accomplice, or any felony in which the defendant uses a firearm.' " (*People* v. *Equarte* (1986) 42 Cal.3d 456, 461, fns. 4 and 5 [229 Cal.Rptr. 116, 722 P.2d 890], quoting former Pen. Code, §§ 667 and 1192.7, subd. (c)(8), respectively; see *People* v. *Piper* (1986) 42 Cal.3d 471, 473, fn. 1 [229 Cal.Rptr. 125, 722 P.2d 899], citing *Equarte.*)

example, in *People* v. *Manners* (1986) 180 Cal.App.3d 826 [225 Cal.Rptr. 798], the defendant had been convicted on an aiding and abetting theory of lewd and lascivious acts with a child (Pen. Code, § 288). The trial court denied probation, finding the defendant ineligible under the statutory provision for a person who occupies a position of special trust, and commits an act of substantial sexual misconduct. (Former Pen. Code, § 1203.066, subds. (a)(9), (b).)[8] (180 Cal.App.3d at p. 828.) On appeal, the defendant argued that this provision did not apply to an aider and abettor who had not personally committed the act of substantial misconduct. (*Id.*, at p. 829.)

The Court of Appeal disagreed. It began by noting that "[a]n appropriate analogy exists in the law of penalty enhancement." (*People* v. *Manners*, *supra*, 180 Cal.App.3d at p. 830.) It therefore cited and discussed *Walker*. In examining the legislative history of former Penal Code section 1203.066, however, it found that the Legislature's main concern was "the harm to the victim, not the defendant's status . . . ." (*Id.*, at p. 833.) "Given the Legislature's concern over the harm caused by the sexual abuse of children, it appears section 1203.066, subdivision (a)(9), must logically apply to aiders and abettors, as well as to perpetrators. The culpability of a person such as defendant who, in essence, condones such abusive behavior and then attempts to hide it, thereby compounding the psychological harm to the child, must be as great as that of the perpetrator." (*Ibid.*)

█ " '[I]n construing a statute, a court [must] ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.] In determining that intent, we first examine the words of the respective statutes: 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.] "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' [Citation.]" ' [Citation.]" (*People* v. *Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232], cert. den. (1996) __ U.S. __ [117 S.Ct. 104, 136 L.Ed.2d 57], quoting *People* v. *Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224], and *Lennane* v. *Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976], respectively.)

█ Penal Code section 664, subdivision (a) brings within its scope "[e]very person who attempts to commit any crime . . . ." This phrase

---

[8]The probation ineligibility provision applied to " '[a] person who occupies a position of special trust and commits an act of substantial sexual conduct.' " "Substantial sexual conduct" was defined as " 'penetration of the vagina or rectum by the penis of the offender or by any foreign object, oral copulation, or masturbation, of either the victim or the offender.' " (*People* v. *Manners, supra*, 180 Cal.App.3d at p. 829, fn. 2, quoting former Pen. Code, § 1203.066, subds. (a)(9), (b).)

necessarily encompasses those who aid and abet an attempt; otherwise, an aider and abettor could not be punished for attempt at all. It then imposes three different measures of punishment on "the person guilty of that attempt," depending on the nature of "the crime attempted":

1. If "the crime attempted" is willful, deliberate, and premeditated murder, "the person guilty of that attempt" is subject to life imprisonment.

2. If "the crime attempted" is any other one in which the maximum sentence is life imprisonment or death, "the person guilty of the attempt" is subject to imprisonment for a term of five, seven, or nine years.

3. If "the offense so attempted" is any other one punishable by imprisonment, "the person guilty of that attempt" is subject to imprisonment for half the term applicable to the completed offense.

Again, these terms necessarily encompass an aider and abettor. Whenever an aider and abettor is convicted of attempt, there is "a crime attempted," even though he or she did not personally attempt the crime. Moreover, under the derivative liability principles of Penal Code section 31, the aider and abettor is a "person guilty of that attempt."

Any other construction would be absurd; if the "willful, deliberate, and premeditated murder" clause could be construed as excluding aiders and abettors, the other clauses of Penal Code section 664, subdivision (a) would have to be construed identically, meaning, again, that an aider and abettor could not be punished for attempt at all.

We conclude that an aider and abettor can be subject to life imprisonment for willful, deliberate, and premeditated murder even if he or she did not personally deliberate or premeditate.

 2. *Failure to Instruct That the Perpetrator's Mental State Must Be a Natural and Probable Consequence of the Target Offense.**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

IV-VII*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 1450.

## VIII

### DISPOSITION

The judgment is affirmed.

Hollenhorst, Acting P. J., McDaniel, J.,* concurred.

Petitions for a rehearing were denied March 18, 1997, and March 27, 1997, and appellants' petition for review by the Supreme Court was denied June 18, 1997.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.