Filed 12/6/21  P. v. Perna CA4/3

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>DEBORAH ANN PERNA,<br><br>    Defendant and Appellant. | G060077<br><br>(Super. Ct. No. 02NF3143)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Maria D. Hernandez, Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

\*        \*        \*

This is an appeal from a trial court's denial of defendant Deborah Ann Perna's petition to vacate her murder conviction and to be resentenced. (Pen. Code, § 1170.95.)[1] Perna's appointed counsel found no arguable issues. (See *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*).) Perna filed a supplemental brief.

Because a jury could not have found the special circumstance charged in this case to be true without finding that Perna had the intent to kill, we affirm the trial court's order denying her section 1170.95 petition.

I

FACTS

We briefly summarize the relevant facts from our prior opinion in this case, *People v. Perna* (July 23, 2007, G036905) [nonpub. opn.] (*Perna*).) "The victim, David Montemayor, managed a trucking company in Rancho Dominguez. He held a 45 percent interest in the company. His father held the other 55 percent. It appeared Montemayor was stealing from the company and operating a side business under the table. A rumor spread through the company that Montemayor had thousands of dollars in cash stored in a coffee can at his house.

"Montemayor's father hired defendant, who is his daughter and Montemayor's sister, to try to rein in Montemayor. Defendant repeatedly confronted Montemayor over the company's finances and his stealing. The confrontations were heated. They would scream and swear at each other. . . ." (*Perna*, *supra*, G036905.)

"Montemayor left his Buena Park home for work one morning in October 2002. Although he made it to work, unlocking a door, he was gone before the first employee arrived. Instead, he was back in Buena Park, driving toward his house, with a blue truck following him. Montemayor, whose wife and children were still at home,

---

[1] Subsequent statutory references are to the Penal Code.

drove past his house and got out of his vehicle. Two men also got out of the car, and began screaming at Montemayor. Montemayor pleaded with them. The men shot Montemayor in the head, killing him.

"The men drove off with a third man in the blue truck. Bystanders notified the police, who pursued and ultimately apprehended the men. The men were Pacoima Flats gang members. . . ." (*Perna*, *supra*, G036905.)

"Their blue truck contained gang graffiti, including the word 'Droopy,' the moniker of a senior Pacoima Flats gang member named Anthony Navarro. One of the gang members dropped a cell phone belonging to Navarro's girlfriend. The cell phone had been used to place several calls that morning to a telephone registered to someone with the same address as Navarro." (*Perna*, *supra*, G036905.) That turned out to be Edelmira Corona, a woman who had worked with Perna at the trucking company. (*Ibid.*) "Corona took a disability leave in September 2002. An agency that provided child care to Corona called the trucking company to verify her employment. Montemayor refused to do so, temporarily depriving Corona of child care." (*Ibid.*)

"Police later searched Navarro's car. They found a note written on stationary used at the trucking company. The note had Montemayor's address and telephone number written on it in defendant's handwriting." (*Perna*, *supra*, G036905.)

Perna "told her niece that one of the 'guys who had shot my uncle Dave' looked like the man in a photograph on Corona's desk. The niece asked whether defendant had told this to the police. Defendant stated she had not, explaining Montemayor had interfered with Corona's disability benefits. The niece encouraged defendant to contact the police, noting Corona had a motive to kill Montemayor. Defendant replied, 'even if [Corona] was involved, look what [Montemayor] did to her.' She stated she gave the police a list of the trucking company's employees without Corona's name on it. Defendant made her niece swear not to tell anyone about Corona or their conversation." (*Perna*, *supra*, G036905.)

3

Corona turned herself in.  The police arranged for her to make recorded calls to Perna.  "Corona told defendant the police had arrested Navarro and found defendant's handwritten note.  Defendant asked Corona what she was talking about, and denied having anything to do with Montemayor's death.  Defendant asked Corona what telephone she was using.  When Corona stated she was using a telephone at someone's house, defendant replied, 'Mira.  Goddammit, don't say what you said to me.'  She later told Corona, 'Shut up.  Shut up.  You know nothing.  F[–].'  Defendant told Corona she would call Corona back 'from the car,' placing the call to Corona's cell phone.

"When defendant called Corona back, she suggested an explanation why Navarro had the note.  Defendant stated, 'There's lots of papers.  Anybody could've got papers from the trash from anyway [*sic*], okay?'  Defendant told Corona, 'You're not gonna say nothing, Mira.'  She repeated that anyone could have pulled the note out of the trash.  Defendant instructed Corona, 'You can't say shit.  You don't know shit.'  She then asked, 'You can't . . . you think they can tap the cell phones?'" (*Perna*, *supra*, G036905.)

As relevant here, Perna was charged with one count of first degree murder during the commission or attempted commission of a robbery.  (§§ 187, subd. (a), 190.2, subd. (a)(17)(A).)

During trial, Corona testified against Perna.  "She stated defendant asked Corona in June 2002 whether she knew anyone who would kill Montemayor.  Corona said she did not know anyone who would do that.  Defendant asked, 'Can't the guy with the tattoos do it?'  Defendant gave Corona a note with Montemayor's name and address on it to give to the man.  Corona replied that the man with the tattoos would not kill Montemayor. Corona left the note in her desk.

"According to Corona, she later arranged for Navarro to come to the trucking company to sell methamphetamine to defendant.  After meeting Navarro, defendant asked Corona whether Navarro would kill Montemayor in exchange for the

4

cash hidden in Montemayor's house. Defendant picked up the note from Corona's desk and gave it to her so Corona could give it to Navarro. Corona passed along defendant's offer to Navarro. She later gave the note to Navarro and reiterated defendant's offer. Navarro told Corona he would kill Montemayor." (*Perna*, *supra*, G036905.)

"When Corona learned the police were looking for her in early October 2002, she called defendant to find out why. Defendant told her Montemayor had been killed. Defendant warned Corona the police had taken her possessions from the trucking company." (*Perna*, *supra*, G036905.)

The jury found Perna guilty of first degree murder and returned a true finding on the robbery murder special circumstance allegation. "The court sentenced defendant to life in state prison without the possibility of parole." This court affirmed the judgment. (*Perna*, *supra*, G036905.)

In August 2019, Perna filed a petition for resentencing pursuant to section 1170.95. She alleged that she "was charged as an aider and abettor. It is clear the prosecution proceeded under a felony murder theory and felony murder is the only basis for Petitioner's murder conviction since the jury found true the special circumstance that the murder was committed during an attempted robbery." Perna asserts she "did not evince reckless indifference to human life," because "mere knowledge a codefendant is armed is insufficient to prove reckless indifference." The district attorney opposed the petition. Perna was represented by counsel, who filed briefs on her behalf.

In October 2020, the trial court denied the petition, finding that Perna had not demonstrated a prima facie case for relief. The court reasoned that since the true finding on the robbery special circumstance required the jury to find that Perna had the intent to kill, she was ineligible for relief. Perna now appeals.

5

II

DISCUSSION

A. *Procedures for* Wende *Review*

When appointed counsel is unable to identify any arguable issues on appeal, a court independently reviews the record for arguable issues. (*Wende*, *supra*, 25 Cal.3d at pp. 441-442.) Generally, "an arguable issue on appeal consists of two elements. First, the issue must be one which, in counsel's professional opinion, is meritorious. That is not to say that the contention must necessarily achieve success. Rather, it must have a reasonable potential for success. Second, if successful, the issue must be such that, if resolved favorably to the appellant, the result will either be a reversal or a modification of the judgment." (*People v. Johnson* (1981) 123 Cal.App.3d 106, 109.)

When appointed counsel files a *Wende* brief, the appellant has the right to file a supplemental brief raising his or her own contentions. (*Wende*, *supra*, 25 Cal.3d at p. 440.) When "the defendant has filed supplemental contentions" and the judgment is affirmed on appeal "the appellate court necessarily must have considered and rejected those contentions." (*People v. Kelly* (2006) 40 Cal.4th 106, 120.) In these situations, the "opinion must reflect the contentions and the reasons that they fail." (*Ibid*.) However, a "decision does not require an extended discussion of legal principles. [Citations.] Moreover, a recitation of each of the defendant's assertions will not be necessary in all cases; the purposes of the constitutional requirement [for a written decision] may in some circumstances be satisfied by a summary description of the contentions made and the reasons they fail." (*Id.* at p. 121.)

This court recently held "that when an appointed counsel files a *Wende* brief in an appeal from a summary denial of a section 1170.95 petition, a Court of Appeal is not required to independently review the entire record, but the court can and should do so in the interests of justice." (*People v. Flores* (2020) 54 Cal.App.5th 266, 269; compare *People v. Cole* (2020) 52 Cal.App.5th 1023, 1028 ["this court has the duty

6

to address any issues raised by the defendant but otherwise may dismiss the appeal without conducting an independent review of the record"].)

B. *Senate Bill No. 1437*

As amended by Senate Bill No. 1437 (2017-2018 Reg. Sess.), section 189, subdivision (e), states: "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life . . . ."

Generally, a defendant who unlawfully kills with malice aforethought is guilty of a murder. (§ 187.) "For purposes of Section 187, malice may be express or implied." (§ 188, subd. (a).) "Malice is express when there is manifested *a deliberate intention* to unlawfully take away the life of a fellow creature." (§ 188, subd. (a)(1), italics added.)

A person may be convicted of crimes as a direct perpetrator, or as an aider and abettor. (§ 31.) An aider and abettor can be held liable for crimes that were intentionally aided and abetted (target offenses); an aider and abettor can also be held liable for any crimes that were unintentional but were reasonably foreseeable (nontarget offenses). (*People v. Laster* (1997) 52 Cal.App.4th 1450, 1462-1463.) Aider and abettor liability for intentional crimes is known as "direct" aider and abettor liability; aider and abettor liability for unintentional crimes is known as the ""'natural and probable consequences" doctrine.'" (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1055.)

A participant in an underlying felony may also be held liable for murder under the felony murder rule. Under the former first degree felony murder rule, a

7

participant could be convicted of murder if the victim was killed during the commission of a predicate felony, regardless of whether the participant had the intent to kill. (See *People v. Cruz* (2020) 46 Cal.App.5th 740, 759-760.)

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

Senate Bill No. 1437 "amended sections 188 and 189 and created new section 1170.95. The amendments to sections 188 and 189 together change the felony murder rules and the 'natural and probable consequences theory' when convicting a participant in a felony for murder, but who did not actually kill the victim." (*In re White* (2019) 34 Cal.App.5th 933, 937, fn. 2.) Eligible persons can petition to dismiss their prior murder convictions and be resentenced if they were convicted under an accomplice liability theory of murder that is no longer valid. (§ 1170.95.)

Procedurally, there are multiple steps in a petition under section 1170.95. First, the petitioner must include a declaration that states he or she is eligible for relief, the petition must also include the case number, date of conviction, and state whether the petitioner requests appointment of counsel. (§ 1170.95, subd. (b)(1)(A)-(C).)

If the petition complies with these requirements, the court appoints counsel. (*People v. Lewis* (2021) 11 Cal.5th 952 (*Lewis*).) The court then evaluates the petition to determine if it makes a prima facie showing that relief is available, and if so, it issues an order to show cause. (§ 1170.95, subd. (c).) At the prima facie stage, the court may use the record of conviction to determine if the petitioner qualifies for relief. (*Lewis*, at pp. 970-

8

971.)[2] Trial transcripts and jury instructions are both part of the record of conviction.[3] (*People v. Daniel* (2020) 57 Cal.App.5th 666, 676-677; *People v. Brimmer* (2014) 230 Cal.App.4th 782, 799-801.)

### C. *The True Special Circumstance Finding Required Intent to Kill*

Perna argues that because she was charged with murder on a felony murder theory, she is entitled to an evidentiary hearing on whether she was a major participant in the crime. The trial transcript shows the prosecution argued two theories of murder: conspiracy and felony murder. She was also charged with the special circumstance of murder in the commission of a robbery, which is a finding separate from and additional to the felony murder charge.

The typical pattern instruction for the special circumstance finding that was used at the time of Perna's trial, CALJIC No. 8.80.1, stated two theories under which the special circumstance could be found true for an aider and abettor. Those theories were aiding and abetting with "the intent to kill," and alternatively, aiding and abetting with "reckless indifference to human life and as a major participant in the commission of the crime."

But here, as the jury instructions show, the court modified the instruction to give *only* the intent to kill portion, not the major participant portion. The entire instruction given to the jury was as follows:

"If you find the defendant in this case guilty of murder of the first degree, you must then determine if one or more of the following special circumstances are true or

---

[2] Perna seems to imply that the prosecutor, in opposing her petition at the prima facie stage, offered new evidence, but does not state what that evidence was. We cannot identify any new evidence the prosecutor offered or the trial court considered.

[3] Counsel identified the use of the jury instructions as a "possible issue[]," but pursuant to *Lewis*, we find no error. (*Lewis*, at pp. 970-971.)

not true: [¶] . . . Murder in the Commission of [a] Robbery. [¶] The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

"If you find that a defendant was not the actual killer of a human being, you cannot find the special circumstance to be true unless you are satisfied beyond a reasonable doubt that: [¶] . . . *such defendant with the intent to kill* aided, abetted, counseled, commanded, induced, solicited, requested, or assisted any actor in the commission of the murder in the first degree[.] [¶] In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously." (Italics added.) The reckless indifference as a major participant portion of the instruction was stricken entirely. This instruction was included in a set of instructions marked as "given." The top of the page of this particular instruction indicates is was "Given as Modified" and is stamped with the trial judge's signature.

The prosecution also stated during closing arguments that for the jury to find the special circumstance allegation true, they must find Perna acted with the intent to kill. Accordingly, based on the argument and the specific jury instructions in this case, the true special circumstance finding required a finding of intent to kill. The jury could not otherwise have found the special circumstance true. No inquiry is therefore necessary into whether Perna had reckless indifference to human life as a major participant in the crime.

Perna further asserts that recent case law addressed the issue of accomplice liability as a "major participant" supports her claim that she has made a prima facie showing, pointing to *People v Banks* (2015) 61 Cal.4th 788, and *People v Clark* (2016) 63 Cal.4th 522. But as Perna admits, these cases only apply in situations where "an accomplice . . . lacks the intent to kill." Because the jury was required to find she harbored the intent to kill in order to find the special circumstance true, this line of authority is inapplicable here.

10

That Perna had the intent to kill was part of the record of conviction. Section 1170.95 does not permit relief in such cases. Senate Bill No. 1437 was adopted, in part, "to ensure that murder liability is not imposed on a person who . . . did not act with the intent to kill." (Stats. 2018, ch. 1015, § 1, subd. (f).) The determination that Perna had the intent to kill is final and precludes relief. Accordingly, the trial court did not err by denying the petition.

## III
## DISPOSITION

The order is affirmed.


MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


MARKS, J.*


*Judge of the Orange Super. Ct., assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.